**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

In re:

NETBANK, INC.

     Debtor.

_____

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
NetBank, f.s.b.,

     Defendant-Appellant,

v.

CLIFFORD ZUCKER, in his capacity as
Liquidating Supervisor for NETBANK,
INC.,

     Plaintiff-Appellee.

_____

Case No.: 3:11-cv-00011-MMH

**AMENDED BRIEF OF APPELLANT**
**FEDERAL DEPOSIT INSURANCE**
**CORPORATION**

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...........................................1

STANDARD OF APPELLATE REVIEW .....................................................................2

STATEMENT OF THE CASE .......................................................................................2

STATEMENT OF FACTS .............................................................................................3

    The Refund ..............................................................................................................4

    The Tax Sharing Agreement ...................................................................................5

    The Decision Below ................................................................................................7

SUMMARY OF ARGUMENT .....................................................................................9

ARGUMENT .................................................................................................................10

    I.   The Refund is the property of the FDIC, as receiver for the Bank ...................10

        A.  The Bank is entitled to the Refund under the Agreement ...........................10

        B.  The Holding Company's bankruptcy does not affect the Bank's ownership of the Refund ......................................................................................................12

            1.   The Agreement does not create a debtor-creditor relationship because it gives the Holding Company no right to borrow or keep the Refund ............................13

            2.   The bankruptcy court's interpretation is inconsistent with basic principles of contract interpretation ...........................................................................18

            3.   An interpretation that the Agreement authorizes the Holding Company to borrow the Refund, without security, is contrary to statute ..................................20

    II.  The Holding Company cannot rely on the Tax Sharing Agreement to establish ownership because the Holding Company has rejected the Agreement ...........................23

CONCLUSION ..............................................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ala. Gold Life Ins. Co. v. Garmany*,
    74 Ga. 51-52(2)(d) (1884)..................................................................................24

*America Net, Inc. v. U.S. Cover, Inc.*,
    532 S.E. 2d 756 (Ga. Ct. App. 2000)..............................................................24

*Bank One, N.A. (Chicago) v. FDIC*,
    No. 04-C-286-S (W.D. Wis. 2005) ...................................................................11

*BSD Bancorp, Inc. v. FDIC (In re BSD Bancorp, Inc.)*,
    No. 94-1341-IEG (S.D. Cal. Feb. 28, 1995) .............................................. 14-16

*Capital Bancshares, Inc. v. FDIC*,
    957 F.2d 203 (5th Cir. 1992) ...........................................................................11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...........................................................................................2

*Empire Fin. Servs., Inc. v. Gingold (In re Real Estate West Ventures, L.P.)*,
    170 B.R. 736 (Bankr. N.D. Ga. 1993) ........................................................ 17-18

*FDIC v. Security Inv. Group, Inc.*,
    No. 95-6609 (JBS) (D.N.J. May 29, 1997)......................................................11

*Florida Polk County v. Prison Health Services, Inc.*,
    170 F.3d 1081 (11th Cir. 1999) .......................................................................19

*Gulfshore Dev. Corp. v. The National Bank of Lee County (In re Gulfshore Dev. Corp.)*,
    144 B.R. 905 (Bankr. M.D. Fla. 1992) ............................................................18

*Hall v. Perry (In re Cochise College Park, Inc.)*,
    703 F.2d 1339 (9th Cir. 1983) .................................................................... 23-24

*Horwitz v. Weil*,
    275 Ga. 467 (2002) ..........................................................................................19

*In re Auto Dealer Servs., Inc.*,
    96 B.R. 360 (Bankr. M.D. Fla. 1989) ..............................................................23

iii

{JA599952;2}

*In re Barker*,
    2010 WL 4882025 (Bankr. N.D. Ga. Oct. 26, 2010)........................................................17

*In re Bob Richards Chrysler-Plymouth Corp.*,
    473 F.2d 262 (9th Cir. 1973) ...........................................................11, 13-14, 16-17

*In re Crouthamel Potato Chip Co.*,
    6 B.R. 501 (Bankr. E.D. Pa. 1980) ...............................................................13

*In re Executive Technology Data Systems*,
    79 B.R. 276 (Bankr. E.D. Mich. 1987) ...........................................................25

*In re First Central Financial Corp.*,
    269 B.R. 481 (Bankr. E.D.N.Y. 2001)...........................................................15

*In re First Penn Corp.*,
    BK-82 01667-B (Bankr. W.D. Okla. July 18, 1986) .........................................11

*In re First Seminole Bancshares, Inc.*,
    No. 584-50156 (Bankr. N.D. Tex. Nov. 4, 1987) .............................................11

*In re Fleck*,
    242 B.R. 188 (M.D. Fla. 1999) ...................................................................2

*In re Florida Park Banks, Inc.*,
    110 B.R. 986 (Bankr. M.D. Fla. 1990) ....................................................11, 14

*In re Kingsley*,
    518 F.3d 874 (11th Cir. 2008) ....................................................................2

*In re McBarnette*,
    173 B.R. 248 (Bankr. N.D. Ga. 1994) .........................................................18

*In re Newlin*,
    370 B.R. 870 (M.D. Ga. 2007) ..................................................................23

*In re Optical Technologies, Inc.*,
    246 F.3d 1332 (11th Cir. 2001) ...................................................................2

*In re Revco D.S., Inc.*,
    111 B.R. 631 (Bankr. N.D. Ohio 1990) .......................................................11

*In re TMCI Electronics*,
    279 B.R. 552 (Bankr. N.D. Cal. 1999) .........................................................11

iv

*Jump v. Manchester Life & Cas. Mgmt. Corp.*,
    438 F. Supp. 185 (E.D. Mo. 1977), *aff'd* 579  F.2d  449 (8th Cir. 1978)............. 11, 13-14

*Libson Shops, Inc. v. Koehler*,
    353 U.S. 382 (1957)....................................................................................................4

*Marcre Sales Corp. v. Jetter*,
    476 S.E. 2d 840 (1996) ...........................................................................................24

*McCoy v. Buckhead Clinic Professional Ass'n*,
    182 S.E. 2d 798 (1971) ...........................................................................................24

*Northwest Nat'l Bank v. OCC*,
    917 F.2d 1111 (8th Cir. 1990) ................................................................................21

*Paladino v. Avnet Computer Technologies, Inc.*,
    134 F.3d 1054 (11th Cir. 1998) ..............................................................................22

*Powers Ferry Constr., Inc. v. Commerce Buildings, Inc.*,
    381 S.E. 2d 755 (Ga. Ct. App. 1989)......................................................................24

*Shivers v. Hunnicutt*,
    220 Ga. 620 (1965) .................................................................................................17

*Siegel v. Boston* (*In re Sale Guaranty Corp.*),
    220 B.R. 660 (B.A.P. 9th Cir. 1998)......................................................................18

*T&B Scottdale Contractors, Inc. v. United States*,
    866 F.2d 1372 (11th Cir. 1989) ..............................................................................17

*Thompkins v. Lil' Joe Records, Inc.*,
    476 F.3d 1294 (11th Cir. 2007) ..............................................................................25

*United States v. Bass Fin. Corp.*,
    No. 83 C 706 (N.D. Ill. April 20, 1984)..................................................................11

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983)................................................................................................13

*Western Dealer Mgmt. v. England*,
    412 U.S. 919 (1973)................................................................................................11

## STATUTES AND REGULATIONS

11 U.S.C. § 365.................................................................................................23

11 U.S.C. § 365(g)..............................................................................................23

11 U.S.C. § 541(d).........................................................................................13, 17

12 U.S.C. § 371c..................................................................... 13, 16, 21-22, 25

12 U.S.C. § 371c(a)........................................................................................22-23

12 U.S.C. § 371(b)(1).........................................................................................21

12 U.S.C. § 371c(c)................................................................... 10, 15, 21-22

12 U.S.C. § 1821(e)..............................................................................................5

26 U.S.C. § 172.....................................................................................................4

26 U.S.C. § 1501...................................................................................................3

26 U.S.C. § 1502...................................................................................................3

26 C.F.R. § 1.1502-1 *et seq.*.................................................................................3

26 C.F.R. § 1.1502-77.......................................................................................5, 13

Fed. R. Civ. P. 56..............................................................................................2, 23

63 Fed. Reg. 64757 (Nov. 23, 1998)..............................................7, 9, 12, 19

Ga. Code Ann. § 13-2-2(4)................................................................................19

## OTHER

Collier on Bankruptcy ¶70.18[4] (14th ed. 1977)...........................................13

Restatement (Second) of Contracts § 203(a)....................................................22

Restatement (Second) of Contracts § 178.........................................................22

{JA599952;2}

**STATEMENT OF JURISDICTION**

This is an appeal from a final order and judgment of the United States Bankruptcy Court for the Middle District of Florida entered on September 30, 2010, and amended on November 30, 2010, which granted the motion for summary judgment filed by Clifford Zucker, in his capacity as Liquidating Supervisor for NetBank, Inc. ("Zucker") and denied the motion for summary judgment filed by the Federal Deposit Insurance Corporation, as receiver for NetBank, f.s.b. ("FDIC"). This Court has jurisdiction over this appeal of a final judgment and order of a bankruptcy court under 28 U.S.C. § 158(a)(1).

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.      Did the bankruptcy court err in construing the tax sharing agreement between NetBank, f.s.b. ("Bank") and its parent company, NetBank, Inc. ("Holding Company"), to find that the parties intended a refund of taxes that resulted from the carryback of the Bank's 2006 net operating loss against the Bank's taxable income in 2005 ("Refund") to be property of the Holding Company's estate where (i) multiple provisions of the agreement and the regulatory requirements of the Bank show that the parties intended to give the Holding Company a right to receive the Refund only in its capacity as the Bank's agent, and (ii) the bankruptcy court's construction is contrary to basic principles of contract interpretation and violates federal law?

2.      Did the bankruptcy court err in relying on the tax sharing agreement to hold that the Refund was property of the Holding Company's bankruptcy estate where the agreement had been rejected by confirmation of the Holding Company's liquidation plan?

{JA599952;2}

## STANDARD OF APPELLATE REVIEW

The bankruptcy court's order granting Zucker's motion for summary judgment and denying the FDIC's motion for summary judgment is reviewed *de novo* on appeal. *See, e.g., In re Kingsley*, 518 F.3d 874, 876 (11th Cir. 2008) (quoting *In re Optical Technologies, Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2001)); *In re Fleck*, 242 B.R. 188, 190 (M.D. Fla. 1999) ("When sitting in its appellate capacity, this Court reviews the grant of summary judgment in bankruptcy proceedings de novo."). A court may grant a motion for summary judgment only where the moving party has demonstrated the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## STATEMENT OF THE CASE

This case concerns the ownership of a tax refund of over $6.2 million ("Refund") arising from consolidated federal income tax returns filed on behalf of the Holding Company and its subsidiaries, including the Bank. The parties do not dispute that the Refund is solely attributable to the earnings history of the Bank and its subsidiaries ("Bank Affiliated Group"), and would have been paid to the Bank had the Bank Affiliated Group filed separate income tax returns.

On September 28, 2007, the Office of Thrift Supervision closed the Bank and appointed the FDIC as Receiver.[1] Adv. Pro. Dkt. #64 at 3. The same day, the Holding Company filed its voluntary petition under Chapter 11 of the Bankruptcy Code. *Id*. at 2.

---

[1] FDIC, Failed Bank Information: NetBank, Alpharetta, GA, Closing Information (available at http://www.fdic.gov/bank/individual/failed/netbank.html).

2

Both the FDIC and Zucker later applied to the Internal Revenue Service ("IRS") to carry back a portion of the Bank Affiliated Group's 2006 net operating loss to obtain a refund of income taxes paid by the Bank Affiliated Group with respect to its 2005 income. Both claimed ownership of the Refund, and Zucker brought this action seeking a declaration that the Refund is property of the Holding Company's bankruptcy estate and turnover of the Refund. Adv. Pro. Dkt. #1.

The FDIC and Zucker moved for summary judgment, and the bankruptcy court entered judgment in favor of Zucker. Adv. Pro. Dkt. #65. The FDIC filed a notice of appeal concurrently with a motion to amend and clarify the bankruptcy court's decision and judgment. Adv. Pro. Dkt. #66-67. On November 30, 2010, the bankruptcy court granted the FDIC's motion in part, and issued an amended decision correcting certain clerical errors. Adv. Pro. Dkt. #86. The FDIC filed an amended notice of appeal on December 9, 2010. Adv. Pro. Dkt. #89.

## STATEMENT OF FACTS

Before OTS appointed the FDIC as receiver, the Bank was a federally chartered savings bank with several subsidiaries. The Bank was wholly owned by the Holding Company. Under the Internal Revenue Code, the Holding Company, Bank, and their subsidiaries ("Consolidated Group") elected to file consolidated income tax returns. 26 U.S.C. § 1501.[2] The Consolidated Group entered into an Amended and Restated Tax

---

[2] Affiliates filing on a consolidated basis are treated, in many ways, as if they were one corporation for tax purposes. *See* 26 U.S.C. § 1502; Treas. Reg. §§ 1.1502-1 *et seq.* Thus, the income and losses of the individual members of the group are aggregated, and the loss of one member can be offset against the income of another member to reduce the group's aggregate tax burden.

{JA599952;2}

Sharing Agreement, effective January 1, 2003 ("Tax Sharing Agreement" or "Agreement") to allocate responsibilities, tax burdens, and benefits among the Group's members.  Adv. Pro. Dkt. #1, Ex. B.

**The Refund**

The Refund at issue resulted from the carryback of losses incurred by the Bank Affiliated Group in the 2006 tax year to offset income earned by the Bank Affiliated Group in the 2005 tax year.[3]  Adv. Pro. Dkt. #1 ¶14.  In both years, the Consolidated Group filed consolidated federal income tax returns.  Adv. Pro. Dkt. #64 at 4-5.  In 2005, the Consolidated Group reported net taxable income of $17,987,259, and incurred tax liability of $6,145,415.  Adv. Pro. Dkt. #64 at 4.  Of these amounts, the Bank Affiliated Group generated all of the Consolidated Group's taxable income and paid all of the taxes.  Adv. Pro. Dkt. #86 at 2.  In 2006, the Consolidated Group had a net operating loss of $94,128,552, resulting in no federal income tax liability for the 2006 tax year.  Adv. Pro. Dkt. #64 at 4-5.  The Bank Affiliated Group generated over $86 million of the Consolidated Group's 2006 net operating loss, which was more than sufficient to generate the entire refund.  Adv. Pro. Dkt. #86 at 2.

The Holding Company requested a refund of $5,737,176 from the IRS based on the tentative carryback of the 2006 net operating loss to the 2005 tax year.  Adv. Pro. Dkt. #64 at 5.  Shortly after the Holding Company submitted this request, and before the IRS made its

---

[3] The Internal Revenue Code permits taxpayers to "carry back" losses incurred in one year to offset income earned in certain prior years, generating a refund of taxes paid in the prior years.  26 U.S.C. § 172.  This principle averages out income peaks and valleys, alleviating potential unfairness from the requirement to calculate and report taxable income on an annual basis.  *See, e.g., Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 386 (1957).

{JA599952;2}

determination, OTS closed the Bank and appointed the FDIC as Receiver.  *Id*. at 3, 5.  The same day, the Holding Company filed for bankruptcy.  *Id*. at 2.

On November 26, 2007, the FDIC, in its capacity as receiver for the Bank and as authorized by Treasury Regulation § 301.6402-7, filed its own request with the IRS, as agent for the Consolidated Group, for a refund of income taxes paid in 2005 based on the tentative carryback of the 2006 loss.  *Id*. at 5.  In February 2008, the FDIC repudiated the Tax Sharing Agreement under 12 U.S.C. § 1821(e).  *Id*.

After receiving notice of the repudiation, the Holding Company sent a letter to the IRS in March 2008, stating the Holding Company's belief that the refund was property of the Holding Company's bankruptcy estate, and that the IRS would violate the automatic stay provided by the Bankruptcy Code if it paid the Refund to the FDIC.  *Id*.  The IRS replied that neither the Holding Company's nor the FDIC's refund requests could be processed because, under IRS regulations, applications for a tentative carryback adjustment must be signed by both the Holding Company, as parent of the Consolidated Group, and the FDIC, as the fiduciary for the Bank.  *Id*.

As a result, the Holding Company and the FDIC filed amended consolidated tax returns for the 2005 tax year reflecting the 2006 losses as a carryback to 2005, and each again claimed ownership of the Refund.  *Id*. at 5-6.

**The Tax Sharing Agreement**

Treasury Regulation § 1.1502-77 provides that the parent in a consolidated group acts as the group's agent with respect to the payment of taxes and receipt of refunds.  26 C.F.R. § 1.1502-77.  The parties' Tax Sharing Agreement expressly recognizes that the Holding

Company acts as agent for the group in dealing with the IRS, and embodies the parties' intent with respect to the allocation of tax refunds.  The Agreement provides that the Holding Company shall transfer to the Bank the amount of any tax refund attributable to its losses, or that it would have received had it filed separately.  Adv. Pro. Dkt. #1, Ex. B.  This is expressed in several of the Agreement's provisions.  Section 3(d), which addresses situations where the Bank Affiliated Group's income is negative, states that the Holding Company

> will pay to the Bank the greater of (i) the current taxable loss benefit to the Bank utilized by [the Holding Company] to reduce its estimated tax payments to the IRS or (ii) the amount the Bank would receive had it filed as a separate entity.

*Id*. § 3(d).

Similarly, section 4(e), which deals with the carryback of losses to prior consolidated return years, states

> If the Bank Affiliated Group incurs a net operating loss, a net capital loss or is entitled to credits against tax as described above in this Section, the amount payable to the Bank Affiliated Group by [the Holding Company] shall be no less than the amount the Bank would have received as a separate entity (including its subsidiaries), regardless of whether the consolidated group is receiving a refund.

*Id*. § 4(e).  The Holding Company must turn over to the Bank any amounts due under this section "not later than thirty (30) days after the date on which a credit is allowed or refund is received with respect to the taxable year to which such payment relates." *Id*. § 4(d).

> Finally, Section 10(a) of the Agreement states the parties' intent to

> allocate the tax liability in accordance with the Interagency Statement on Income Tax Allocation in a Holding Company Structure …. Under this guidance, tax settlements between the Bank Affiliated Group and the NetBank consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity.

{JA599952;2}

*Id*. § 10(a).  The Interagency Statement is a joint policy issued by the federal banking regulators to provide uniform guidance on the structure of tax sharing agreements.  63 Fed. Reg. 64757 (Nov. 23, 1998).  The regulators aimed to ensure that subsidiary banks would receive no less favorable treatment under such agreements than if they were separate taxpayers.  *Id*. at 64758.  Consistent with that purpose, and most significantly here, the Interagency Statement provides that "a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members," and the agreement "should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  *Id*. at 64759.

In September 2008, the bankruptcy court entered an order confirming the Holding Company's Second Amended Liquidating Plan of Reorganization ("Plan").  Main Case Dkt. #475.  The Plan rejected all executory contracts not specifically assumed as of the date of the order, including the Tax Sharing Agreement.  Adv. Pro. Dkt. #64 at 36.

**The Decision Below**

In October 2008, Zucker filed his Complaint in the instant action, seeking a declaratory judgment that the Refund is property of the Holding Company's bankruptcy estate.  Adv. Pro. Dkt. #1.  The Complaint initially named both the FDIC and the IRS as defendants because the IRS had not yet paid the Refund at the time the Complaint was filed. The parties later agreed that the IRS would pay the Refund to the FDIC to hold in escrow pending a final determination of ownership, and the IRS was dismissed from the suit.  Adv. Pro. Dkt. #35.

{JA599952;2}

Both Zucker and the FDIC moved for summary judgment.  Adv. Pro. Dkt. #46, 49.
The bankruptcy court determined that, because the parties had entered into an agreement to
allocate tax liabilities and refunds, the Agreement controlled whether the Holding Company
had any interest in the Refund so as to make it property of the Holding Company's
bankruptcy estate.  Adv. Pro. Dkt. #64 at 14.  The court rejected the argument that the
Holding Company receives and maintains any refunds as agent for the consolidated group,
and held that the Refund was property of the Holding Company's estate because the
Agreement showed that the parties intended to establish a debtor-creditor relationship
between the Holding Company and the Bank.  *Id*. at 38-39.  The court based that finding
principally on the absence of provisions expressly creating an agency relationship.  Thus, the
court noted that

> [b]ecause of the absence of a provision in the … Tax Sharing Agreement in
> the instant proceeding requiring that the tax refunds be placed in escrow, the
> absence of a provision requiring that the tax refunds be segregated, and the
> absence of any restrictions on how the money might be used between the date
> of receipt by the parent and the date of payment to the subsidiary evidence a
> lack of direction and control on the part of the parent [sic], [it] evidence[s] an
> intent to create a debtor-creditor relationship.

*Id*. at 21-22.

The court also found that the Holding Company's rejection of the Agreement
did not affect Zucker's ability to rely upon it to prove ownership, and the FDIC's
repudiation of the Agreement was void as a violation of the bankruptcy automatic
stay.  *Id*. at 32, 36.  For the same reason, the court also deemed void the FDIC's
actions to obtain possession of the Refund from the IRS.  *Id*. at 32.

{JA599952;2}

As part of its decision granting the Holding Company's motion for summary judgment, the bankruptcy court ordered the FDIC to turn the Refund over to Zucker.  Adv. Pro. Dkt. #65 at 2.  The FDIC moved for a stay pending appeal, and the court entered a consent order by which the parties agreed that the FDIC would turn the Refund over to Zucker to hold in escrow pending further agreement or a final, non-appealable order regarding ownership of the Refund.  Adv. Pro. Dkt. #91 at 2-3.  Under the terms of the order, the parties have reserved all rights with respect to the Refund, and no presumption or adverse inference may be drawn from Zucker's involvement in holding or depositing the Refund.  *Id.* at 3.

## SUMMARY OF ARGUMENT

Both the parties' Agreement and well-established legal principles require that tax refunds attributable solely to the Bank's earnings history belong to the Bank.  Where no agreement gives the parent a right to keep or borrow such refunds, the parent receives them from the IRS only as agent-trustee for the subsidiary, and the refunds do not become property of the parent's bankruptcy estate.

The Agreement confirms the parties' intent to adhere to this principle.  It contains no language granting the Holding Company a beneficial interest in the Refund and explicitly incorporates the Interagency Statement, which provides that a tax sharing agreement "should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  63 Fed. Reg. at 64759. The Agreement also could not reasonably be interpreted as intending to permit the Holding

{JA599952;2}

Company to borrow the Refund, because such an agreement would expressly violate statutory restrictions on bank lending to affiliates.

The bankruptcy court ignored these unequivocal indicators of the parties' intent, focusing instead on the absence of certain formal trappings of an agency relationship in the Agreement.  The absence of such provisions, however, does not support the court's conclusion because (i) the parties' intent is otherwise amply evidenced in the Agreement; (ii) well-established case law finds an agency relationship, notwithstanding the absence of the usual indicia, even where no agreement exists to allocate refunds to the subsidiary; and (iii) 12 U.S.C. § 371c(c) would render such missing provisions unnecessary to protect the Bank, and thus irrelevant, if the intent had been to create a lawful loan from the Bank to the Holding Company.  The Agreement thus does not evidence an intention to make the Holding Company the Bank's debtor, and the Refund is not property of the Holding Company's bankruptcy estate.

Moreover, even if the Agreement could be construed to create a debtor-creditor relationship, the Agreement is no longer in force because the Holding Company has chosen to reject the Agreement through its bankruptcy case.  This acted as a breach of the Agreement and rendered it unenforceable against the non-breaching Bank.

## ARGUMENT

**I.      The Refund is the property of the FDIC, as receiver for the Bank.**

**A.      The Bank is entitled to the Refund under the Agreement.**

Courts have consistently held that, in the absence of an enforceable agreement to the contrary, a refund that is attributable to the earnings history of one member of an affiliated

{JA599952;2}

group is owned by that member.  *In re Bob Richards Chrysler-Plymouth Corp*., 473 F.2d 262 (9th Cir. 1973), *cert. denied sub. nom. Western Dealer Mgmt. v. England*, 412 U.S. 919 (1973); *Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203 (5th Cir. 1992); *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 438 F. Supp. 185 (E.D. Mo. 1977), *aff'd* 579  F.2d  449 (8th Cir. 1978); *In re TMCI Electronics*, 279 B.R. 552 (Bankr. N.D. Cal. 1999); *In re Revco D.S., Inc*., 111 B.R. 631 (Bankr. N.D. Ohio 1990); *In re Florida Park Banks, Inc.*, 110 B.R. 986 (Bankr. M.D. Fla. 1990); *Bank One, N.A. (Chicago) v. FDIC*, No. 04-C-286-S (W.D. Wis. 2005) (Add. A); *FDIC v. Security Inv. Group, Inc*., No. 95-6609 (JBS) (D.N.J. May 29, 1997) (Add. B); *In re First Seminole Bancshares, Inc*., No. 584-50156 (Bankr. N.D. Tex. Nov. 4, 1987) (Add. C); *In re First Penn Corp.*, BK-82 01667-B (Bankr. W.D. Okla. July 18, 1986) (Add. D); *United States v. Bass Fin. Corp.*, No. 83 C 706 (N.D. Ill. April 20, 1984) (Add. E). The seminal case, *Bob Richards*, lays out the general rule explaining that, "[a]llowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent."  473 F.2d at 265; *see also In re TMCI Electronics*, 279 B.R. 552, 558 (Bankr. N.D. Cal. 1999) ("To permit a bankrupt company to appropriate its bankrupt subsidiary's assets absent an express or implied agreement to do so unjustly enriches the parent (and the parent's creditors) to the jeopardy of the subsidiaries' creditors.").

Here, the Agreement allocates the Refund to the Bank.  Section 4(e) of the Agreement clearly provides that the Bank must receive an amount "no less than the amount the Bank would have received as a separate entity (including its subsidiaries)" when its losses are carried back to generate a refund.  Adv. Pro. Dkt. #1, Ex. B § 4(e).

11

Just as nothing in the Agreement allocates any portion of the Refund to the Holding Company, so too nothing in the Agreement authorizes the Holding Company to borrow or use the Refund to the detriment of the Bank.  To the contrary, section 10(a) of the Agreement expresses the parties' intent "to allocate the tax liability in accordance with the Interagency Statement."  The Interagency Statement requires that "tax settlements between the Bank Affiliated Group and the [Holding Company] consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity."  63 Fed. Reg. at 64758.  It also prohibits the Holding Company from characterizing "refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  *Id*. at 64759.

The parties' intent under these provisions could not have been clearer—the Bank is entitled to any refunds attributable solely to its earnings history, and the Holding Company receives and holds such refunds solely as agent for the Bank.  The bankruptcy court's interpretation is directly contrary to these clear provisions.

**B.     The Holding Company's bankruptcy does not affect the Bank's ownership of the Refund.**

The only reason Zucker questions ownership in this case is because of an event that the Agreement does not specifically address—the bankruptcy of the Holding Company.  Under the bankruptcy court's strained interpretation, the Agreement's clear allocation of the Refund to the Bank means nothing in the event of bankruptcy because the Agreement did not happen to provide for escrow, segregation, or restriction on the use of refunds during the thirty-day administrative period allowed for transfer of the Refund to the Bank.  Adv. Pro. Dkt. #64 at 21-22.  In other words, the bankruptcy court reached its conclusion based not on

{JA599952;2}

any express provision in the Agreement authorizing a loan of the Bank's Refund to the

Holding Company, but on the absence of certain provisions that an agency agreement might

contain.  This conclusion ignores (i) the express language of the Agreement, as explained

above; (ii) the equal absence of certain provisions required for a loan agreement, including

the provision of collateral to meet the requirements of 12 U.S.C. § 371c; and (iii) established

principles of contract interpretation.

>   **1. The Agreement does not create a debtor-creditor relationship because
>   it gives the Holding Company no right to borrow or keep the Refund.**

Under well-settled principles of bankruptcy law, property held by a bankrupt entity in

trust or as agent for another is not regarded as property of the bankrupt entity.  11 U.S.C.

§ 541(d); *United States v. Whiting Pools, Inc*., 462 U.S. 198, 205 n.10 (1983) (noting that

"Congress plainly excluded property of others held by the debtor in trust" from the

bankruptcy estate); *In re Crouthamel Potato Chip Co*., 6 B.R. 501, 507 (Bankr. E.D. Pa.

1980) ("if property is in a bankrupt's hands as … agent, the [bankruptcy] trustee holds it as

such, and the … principal may recover the property or its proceeds") (quoting 4A Collier on

Bankruptcy ¶70.18[4] at 199-200 (14th ed. 1977)).  For this reason, a tax refund belonging to

a subsidiary cannot become part of the parent's bankruptcy estate unless the parties have

agreed that the parent "ha[s] a[ ] right to keep the refund."[4]  *See Bob Richards*, 473 F.2d at

265.  Otherwise, the parent "act[s] as a trustee of a specific trust and [is] under a duty to

return the tax refund to the [subsidiary]."  *Id.*; *see also Jump*, 438 F. Supp. at 189 (a refund

---

[4] While IRS regulations generally provide for payment of refunds to the parent on behalf of
the consolidated group, such payment does not, in itself, give the parent any ownership
interest in the refund.  Treas. Reg. § 1.1502-77; *see also Bob Richards*, 473 F.2d at 265.
Moreover, in this case, the Holding Company never had possession of the Refund.

{JA599952;2}

"is not a debt owed by [parent] to [subsidiary], but rather, a fund which [parent] holds in a specific trust for [subsidiary]"); *BSD Bancorp, Inc. v. FDIC* (*In re BSD Bancorp, Inc.*), No. 94-1341-IEG (S.D. Cal. Feb. 28, 1995) (Add. F) at 12 (tax allocation agreement permitting loan of refunds to a debtor holding company on certain conditions does not abrogate default agency relationship when conditions for loan are not satisfied); *Florida Park Banks*, 110 B.R. at 989 (debtor holding company not entitled to tax refund attributable to the earnings history of its failed bank subsidiary).

No such agreement exists here. While "parties are free to adjust among themselves the ultimate tax liability" by agreement, the dispute here does not concern the allocation of refunds, but the capacity in which the Holding Company receives refunds that are clearly allocated to the Bank. *Cf. Bob Richards*, 473 F.2d at 264. The allocation of tax refunds and the status of the parent with respect to those refunds are distinct questions, to which *Bob Richards* provides distinct answers. While "[n]ormally" courts will respect an agreement as to the allocation of tax burdens and benefits, the agreement will not affect the parent's status as agent-trustee unless the agreement gives the parent a right to borrow or keep the refund. *Id*. at 264-65.

In *BSD Bancorp*, a case involving a failed depository institution, the court further explained this distinction. The court rejected the contention that "the very existence of a tax allocation agreement destroys the principal-agent relationship." Add. F at 9. Instead, the agreement must "expressly or impliedly override" the parent's principal-agent status if it intends to create a debtor-creditor relationship. *Id*. at 10. The court examined the "economic reality" of the transaction, and determined that because the agreement allocated refunds to

14

the bank, and exhibited no intent to lend any of those refunds to the parent except in certain specifically defined circumstances, the agreement "strongly suggests an intent to maintain a principal-agent relationship." *Id.* at 11.

The bankruptcy court thus was required to search for affirmative indicia of intent to give the Holding Company the right to borrow or keep the Refund. The court erred by ignoring the distinction recognized in *Bob Richards* and *BSD Bancorp* between an agreement concerning the allocation of tax refunds and an agreement concerning the capacity in which a parent receives tax refunds for a consolidated group. That error was fundamental because it led the court to start from the faulty premise that the mere existence of the Agreement so changed the nature of the parties' relationship that the court could no longer presume that the parties intended the Holding Company to act solely as agent. Adv. Pro. Dkt. #64 at 14, 21-22. The court, however, provided no basis for interpreting the Agreement to violate the statute, and did not explain why any subsidiary (or regulator) ever would agree to a loan of the subsidiary's refund to the parent on an unsecured basis when 12 U.S.C. § 371c(c) expressly prohibits such a transaction. Nor does the court explain what interest the Holding Company would have in seeking such an illegal agreement.

Instead, relying almost entirely on *In re First Central Financial Corp.*, 269 B.R. 481 (Bankr. E.D.N.Y. 2001),[5] the court gave dispositive weight to things the Agreement does *not* say, rather than to what it *does* say. Adv. Pro. Dkt. #64 at 21-22. Because the Agreement says nothing at all with respect to changing the Holding Company's agency status, the

---

[5] The decision was affirmed on appeal, but the appellate decision addressed only whether the refund was subject to a constructive trust. 377 F.3d 209 (2d Cir. 2004).

{JA599952;2}

court's conclusion that the Agreement must have intended to create a debtor-creditor relationship is entirely without foundation.

The court found the absence of escrow requirements or restrictions on the Holding Company's use of refunds pending distribution to be dispositive. *Id*. But neither the court, nor any of the cases it cites, explains the basis for such requirements where there is no question that, in the absence of an agreement, the Holding Company would hold the Refund as agent-trustee for the Bank, and the Agreement provides no indication that the parties intended to change that capacity by giving the Holding Company any beneficial interest in the Refund. In particular, *First Central* provides no support for the court's conclusion because it is factually distinguishable. The agreement at issue there did not arise in the same regulatory context, and the decision makes no reference to any statutory restrictions similar to 12 U.S.C. § 371c.

The court cannot be correct that escrow and use restrictions are necessary for the FDIC to show ownership because that would contradict the entire line of *Bob Richards* cases. In those cases, there were no written requirements at all—either on the subject of allocation, or the capacity in which the parent received refunds. And yet *Bob Richards* rejects the idea that the refund is a debt owed to the subsidiary, and holds that the Holding Company's agency status is clear from the consolidated return provisions of the Internal Revenue Code, and the unjust enrichment that would result from a failure to recognize that status. 473 F.2d at 265. *BSD Bancorp* recognizes these underlying principles, and correctly requires a written agreement to contain a strong expression of intent to supersede the agency relationship. Add. F at 10.

16

Moreover, the type of "agency" *Bob Richards* describes is not a traditional agency relationship requiring evidence of the principal's direction and control, but is instead a representative relationship required by regulation that creates a resulting trust.  473 F.2d at 265 (describing the capacity in which the agent for the consolidated group received the refund "as a trustee of a specific trust").  Such trusts arise where one party holds only bare legal title to certain property while another party retains beneficial and equitable ownership.  *See, e.g., In re Barker*, 2010 WL 4882025, at * 7 (Bankr. N.D. Ga. Oct. 26, 2010) ("A resulting trust under Georgia law is one where legal title is in one person, but the beneficial interest is in another.") (citing *Shivers v. Hunnicutt*, 220 Ga. 620 (1965)).   Thus, *Bob Richards* acknowledges that a parent may have bare legal title to a subsidiary's refund based on its status as agent for the consolidated group, but the parent does not acquire beneficial or equitable ownership unless an agreement gives the parent a right to borrow or keep the refund.  473 F.2d at 265.

The Bankruptcy Code also recognizes this dichotomy between legal title and equitable ownership, and any property to which another party holds beneficial and equitable ownership is not property of the debtor's bankruptcy estate.  11 U.S.C. § 541(d); *T&B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (funds deposited into bank account by contractor in the name of subcontractor did not become part of subcontractor's bankruptcy estate); *Barker*, 2010 WL 4882025, at * 7 (beneficial interest in stock held in the debtor's name was not property of the estate under Georgia law); *Empire Fin. Servs., Inc. v. Gingold* (*In re Real Estate West Ventures, L.P.*), 170 B.R. 736, 743-44 (Bankr. N.D. Ga. 1993) (security deposits held in trust for tenants under Georgia law did not

17

become part of landlord's estate in bankruptcy); *In re McBarnette*, 173 B.R. 248, 249-50 (Bankr. N.D. Ga. 1994) (vehicle held in the name of the debtor, but purchased by third-party, was held in a resulting trust under Georgia law and was not property of the debtor's estate); *Gulfshore Dev. Corp. v. The National Bank of Lee County* (*In re Gulfshore Dev. Corp.*), 144 B.R. 905, 909 (Bankr. M.D. Fla. 1992) (certificate of deposit was not property of the estate even though it was held in the name of the debtor because other party advanced funds for its purchase and "the parties never intended that the Debtor would be permitted to cash in the C.D. for its own use");  *Siegel v. Boston* (*In re Sale Guaranty Corp.*), 220 B.R. 660, 664 (B.A.P. 9th Cir. 1998) (because third-parties paid consideration for real property "and the facts suggest no basis to infer a gift to Debtor, it is presumed that the Debtor held the properties in resulting trust").

### 2. The bankruptcy court's interpretation is inconsistent with basic principles of contract interpretation.

While the complete absence of any indicia of intent to alter the Holding Company's agent-trustee status alone demolishes the foundation of the court's decision, in this case the parties went further—they included express terms in the Agreement that show their intent *not* to give the Holding Company any beneficial interest in refunds attributable to the Bank.  This intent is made even more apparent by applying basic principles of contract interpretation.

Section 10(a) of the Agreement clearly states that the parties "intend[ ] to allocate the tax liability in accordance with the Interagency Statement," with the aim that "tax settlements between the Bank Affiliated Group and the NetBank consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity."  Adv. Pro. Dkt. #1, Ex. B § 10(a).  The Agreement thus shows the

18

parties' intent to be bound by the Interagency Statement, including its proscription that "an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  63 Fed. Reg. at 64759.  The bankruptcy court's conclusion clearly contravenes this proscription, and results in "less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity."

The bankruptcy court, however, completely ignored the parties' stated intent to adopt all of the Interagency Statement's prescriptions for "no less favorable treatment."  Instead, the court focused only on the four specific principles listed in Section 10(a), which address various aspects of tax payment and allocation.  Adv. Pro. Dkt. #64 at 30-31.  Because none of those principles address the capacity in which the Holding Company receives refunds, the court concluded that Section 10(a) provided no illumination on the subject.  Adv. Pro. Dkt. #64 at 31.  The court was wrong.

"It is a venerable principle of contract law that the provisions of a contract should be construed so as to give every provision meaning."  *Florida Polk County v. Prison Health Services, Inc.*, 170 F.3d 1081, 1084 (11th Cir. 1999); *see also Horwitz v. Weil*, 275 Ga. 467, 468 (2002); Ga. Code Ann. § 13-2-2(4) ("The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part.").  The bankruptcy court's selective view of section 10(a) gives no effect to the parties' broader statement of intent, in particular the guarantee of "no less favorable treatment."  Because the bankruptcy court determined that the Agreement

19

gives the Holding Company an ownership interest in the Refund, contrary to the Interagency Statement's guidance, the bankruptcy court erroneously determined that the Bank must wait in line with the Holding Company's other unsecured creditors to receive its share of a refund that otherwise would have belonged to it in full and without delay. Such "less favorable treatment" is contrary to the parties' intent and nullifies express language in the Agreement.

Section 9 of the Agreement reinforces the parties' intent to limit the Holding Company's role to that of the Bank's agent. The provision appoints the Holding Company as "agent and attorney-in-fact" for members of the Consolidated Group with respect to, at least, the procedural aspects of tax filings. Adv. Pro. Dkt. #1, Ex. B § 9. Nothing in the Agreement expresses intent to give the Holding Company any beneficial interest with respect to the Bank's property.

### 3. An interpretation that the Agreement authorizes the Holding Company to borrow the Refund, without security, is contrary to statute.

The bankruptcy court points to the Agreement's lack of provisions controlling the Holding Company's use of refunds pending payment to the Bank as an indicator that the Holding Company did not hold the funds in an agency capacity. The court infers that the Holding Company was authorized to borrow the Refund because the Holding Company could have used the Refund pending distribution, with no limitations imposed by the Agreement.

This interpretation cannot be right because it ignores the Bank's status as a regulated entity, and the external restrictions and guidance that would have prohibited the Holding Company from using any refunds belonging to the Bank. Although the Agreement gives the

{JA599952;2}

Holding Company thirty days to pay Refunds over to the Bank,[6] this can reasonably be interpreted as only an administrative accommodation. Any attempt to use those funds in the interim would be prohibited under 12 U.S.C. § 371c(c) unless the Holding Company provided adequate collateral to the Bank. Specifically, § 371c(c) prohibits members of the Federal Reserve System from extending credit to their affiliates,[7] unless the loan is secured by collateral valued at 100 percent or more of the amount of the loan, depending on the type of security. The statute sweeps broadly to prevent the misuse of bank resources in financial transactions between the bank and its affiliates. *See Northwest Nat'l Bank v. OCC*, 917 F.2d 1111, 1118 (8th Cir. 1990).

Nothing in the Agreement indicates that the Holding Company would provide any collateral to secure a thirty-day loan of the Bank's refunds. Obviously, if such collateral were provided, escrow requirements or use restrictions would be unnecessary. In light of § 371c, it would be unreasonable to infer that the Agreement intended to give the Holding Company an interest in refunds allocated to the Bank solely because it did not explicitly prohibit the Holding Company from using them pending distribution.

Otherwise, one must conclude that the parties intended from the outset to violate federal law and mislead the Bank's regulators. Under well-settled principles of contract interpretation, courts generally should prefer an interpretation that makes the contract lawful

---

[6] *See* Adv. Pro. Dkt. #1, Ex. B §§ 4(d), 5.

[7] The Holding Company is an affiliate under the statute. 12 U.S.C. § 371c(b)(1) (including in the term "affiliate," "any company that controls the member bank and any other company that is controlled by the company that controls the member bank").

{JA599952;2}

to one that renders it unlawful. *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1058 (11th Cir. 1998); Restatement (Second) of Contracts § 203(a).

Finally, even if the Agreement did intend to violate § 371c, it would be unenforceable on grounds of public policy. *See* Restatement (Second) of Contracts § 178 ("A … term of an agreement is unenforceable on grounds of public policy if … the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."). The Holding Company provided no consideration for the privilege of borrowing the Bank's refunds, and the convenience value of consolidated filing falls far short of the harm to the Bank and the Bank's creditors under the bankruptcy court's interpretation. Any limited interest the Agreement might give the Holding Company in a short-term loan of the Refund is clearly outweighed by the banking regulators' interest, as expressed in § 371c and the Interagency Statement, in protecting banks against arrangements that put bank funds, and thus the deposit insurance fund, at risk without adequate protection or compensation.

The bankruptcy court gave short-shrift to these arguments. It failed to consider the collateral requirement in § 371c(c), focusing only on the general prohibition in § 371c(a) of interaffiliate transactions that exceed a certain percentage of the capital stock and surplus of a bank. The court then concluded that it could not "determine from the record before it that the Tax Sharing Agreement violates these restrictions." Adv. Pro. Dkt. #64 at 32. That is clearly incorrect.

None of the facts relevant to determining whether the Agreement violates § 371c(c), or § 371c(a) for that matter, are unknown or in dispute. Only examination of the Agreement is necessary to show that, if the bankruptcy court's interpretation were adopted, the

22

Agreement would permit a thirty-day extension of credit from the Bank to the Holding

Company with no accompanying provision for collateral.  It is also clear that the Bank did

not meet the capital requirements of § 371c(a) necessary to make the loan.[8]

**II.     The Holding Company cannot rely on the Tax Sharing Agreement to establish
         ownership because the Holding Company has rejected the Agreement.**

  Even if the Agreement could be construed to give the Holding Company an interest in

the Refund, the bankruptcy court erred in enforcing this aspect of the Agreement in light of

the Holding Company's rejection under 11 U.S.C. § 365.[9]

  Rejection of an agreement under 11 U.S.C. § 365 is deemed a breach as of the date

the bankruptcy petition was filed.  11 U.S.C. § 365(g).  A trustee thus cannot enforce his

rights under a rejected contract.  *See, e.g., In re Auto Dealer Servs., Inc.*, 96 B.R. 360, 364

(Bankr. M.D. Fla. 1989) (debtor may not rely on a rejected dealer services agreement to

compel turnover of advance unearned commissions); *In re Newlin*, 370 B.R. 870, 876 (M.D.

Ga. 2007) (Chapter 7 trustee cannot enforce a mandatory purchase right that "arises solely

from a Partnership Agreement that has been deemed rejected"); *see also Hall v. Perry* (*In re

Cochise College Park, Inc.*), 703 F.2d 1339, 1356 (9th Cir. 1983) ("Payments made on an

executory contract after rejection are not property of the bankrupt estate.").

---

[8] In any event, the court's conclusion that there are unresolved factual issues could, at best,
provide a reason for denying, not granting, Zucker's motion for summary judgment.  *See*
Fed. R. Civ. P. 56.

[9] The Holding Company's Plan rejected all executory contracts not specifically assumed by
the Plan Confirmation Date.  Main Case Dkt. #402, Section 7.2.  The Holding Company did
not assume the Agreement.

Additionally, state law controls the rights a party has under an agreement between a debtor and a third party.  *Hall*, 703 F.2d at 1348 n.4.  Under Georgia law, which applies under the terms of the Agreement,[10] a party cannot enforce a contract it has breached against the non-breaching party.  *See America Net, Inc. v. U.S. Cover, Inc.,* 532 S.E. 2d 756, 760 (Ga. Ct. App. 2000) ("a plaintiff whose breach of a contract is so material as to amount to a repudiation of the contract itself, may not recover upon breach of such contract by the defendant") (quoting *McCoy v. Buckhead Clinic Professional Ass'n*, 182 S.E. 2d 798 (1971); *Marcre Sales Corp. v. Jetter*, 476 S.E. 2d 840 (1996)); *Powers Ferry Constr., Inc. v. Commerce Buildings, Inc.*, 381 S.E. 2d 755, 756 (Ga. Ct. App. 1989) ("[a] party to an entire contract who has partly performed it and subsequently abandons the further performance according to its stipulations, voluntarily and without fault on the part of the other party or his consent thereto, can recover nothing for such part performance") (quoting *Ala. Gold Life Ins. Co. v. Garmany*, 74 Ga. 51-52(2)(d) (1884)).

Disregarding these principles, the bankruptcy court determined that rejection had no effect on the Holding Company's interest in the Refund because the Holding Company's right to the Refund vested before the Petition Date.  Adv. Pro. Dkt. #64 at 36.  Under the bankruptcy court's interpretation of the Agreement, however, the Holding Company's ownership interest stems from its right to borrow the Refund after it is paid by the IRS—an event that occurred post-petition.

Moreover, even if the *Consolidated Group's* right to a refund arose when the Bank incurred its 2006 net operating loss, the *Holding Company's* ownership interest could arise, if

---

[10] Adv. Pro. Dkt. #1, Ex. B § 10(c).

at all, only by post-petition enforcement of the Agreement.  The Holding Company would have nothing more than bare legal title to the Refund unless it could enforce the provisions of the Agreement that, under the bankruptcy court's interpretation, give the Holding Company a right to borrow refunds for thirty days pending distribution.  Unlike the cases on which the bankruptcy court relied, the Holding Company would not have full legal and equitable title to the property in question, except by post-petition enforcement of the Agreement.  *Cf. Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1308 (11th Cir. 2007); *In re Executive Technology Data Systems*, 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987).  Because such enforcement is precluded by the Holding Company's rejection, the bankruptcy court erred in relying on rights created by the Agreement to find that the Refund was property of the Holding Company's bankruptcy estate.

## CONCLUSION

For the foregoing reasons, the FDIC respectfully requests that the bankruptcy court's September 30, 2010 decision and judgment, as amended on November 30, 2010, be reversed, and that this case be remanded to the bankruptcy court with instructions (1) to enter summary judgment in favor of the FDIC and (2) to take any other action necessary to comply with this Court's decision.  In the alternative, the FDIC requests that the Court remand for further consideration of the impact of 12 U.S.C. § 371c on the Agreement.

Respectfully submitted,

Dated: February 16, 2011

s/David E. Otero_____
DAVID E. OTERO
Florida Bar No.: 651370
ADINA L. POLLAN
Florida Bar No.: 15639

25

AKERMAN SENTERFITT
50 North Laura Street, Suite 2500
Jacksonville, FL 32202
Telephone: (904) 798-3700
Facsimile: (904) 798-3730
david.otero@akerman.com
adina.pollan@akerman.com

COLLEEN J. BOLES
Assistant General Counsel
LAWRENCE H. RICHMOND
Senior Counsel
MICHELLE OGNIBENE
Counsel
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 Fairfax Drive, VS-D-7144
Arlington, Virginia 22226-3500
Telephone: (703) 562-2121
Facsimile: (703) 562-2496
mognibene@fdic.gov

*Attorneys for Appellant Federal Deposit
Insurance Corporation, as Receiver for
NetBank, f.s.b.*

{JA599952;2}

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2011, a copy of the foregoing was filed electronically using the CM/ECF system, which will send a Notice of Electronic Filing to all participants who are registered CM/ECF users.

s/Adina L. Pollan_____
Adina L. Pollan

27