UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re: NetBank, Inc.,

      Debtor.

Bankruptcy Case No: 3:07-bk-4295-JAF

Adversary No. 3:08-ap-00346-JAF

_____

Federal Deposit Insurance
Corporation, as Receiver for
NetBank, f.s.b.,

      Appellant,

Case No. 3:11-cv-00011-J-34-MMH

v.

Clifford Zucker, in his capacity as
Liquidating Supervisor for NetBank, Inc.,

      Appellee.

_____/

**BRIEF OF APPELLEE CLIFFORD ZUCKER, IN HIS CAPACITY
AS LIQUIDATING SUPERVISOR FOR NETBANK, INC.**

Todd C. Meyers
Alfred S. Lurey
Shane G. Ramsey
KILPATRICK TOWNSEND &
STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
(404) 815-6500

Betsy C. Cox
ROGERS TOWERS, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, Florida 32207
(904) 398-3911

Attorneys for Appellee

TABLE OF CONTENTS

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ........................................... 1

REQUEST FOR ORAL ARGUMENT ................................................................................ 2

STATEMENT OF THE ISSUES PRESENTED ................................................................... 2

APPLICABLE STANDARD OF APPELLATE REVIEW .......................................................... 2

STATEMENT OF THE CASE ........................................................................................... 3

    The Bankruptcy Case ............................................................................................ 3

    The Tax Sharing Agreement ................................................................................... 4

    Alleged Rejection of Tax Sharing Agreement .......................................................... 6

    The Adversary Proceeding ...................................................................................... 6

PRELIMINARY STATEMENT ........................................................................................ 7

ARGUMENT ............................................................................................................. 10

    A.    The Tax Sharing Agreement governs the rights of the parties thereto regarding tax matters and establishes a debtor-creditor relationship between the Debtor and the Bank. Accordingly, the Tax Refund is property of the Debtor's bankruptcy estate. .................................. 10

        1.    The Structure of the Tax Sharing Agreement ............................................. 12

        2.    Supporting Authority ................................................................................ 15

    B.    The Interagency Policy Statement does not affect the status of the Tax Refund as property of the Debtor's estate. .................................................... 23

    C.    The Debtor's independent contractual obligation under the Tax Sharing Agreement to pay the Bank the tax benefit amount to which it would have been entitled had the Bank Affiliated Group filed a separate tax return does not constitute a "loan" of tax refunds by the Bank to the Debtor in violation of 12 U.S.C. § 371c. .................... 28

    D.    The Tax Refund is property of the Debtor's estate even if the Tax Sharing Agreement was rejected pursuant to the Debtor's Plan ........................... 30

CONCLUSION .......................................................................................................... 33

i

## TABLE OF AUTHORITIES

**Cases**

Am. Net, Inc. v. U.S. Cover, Inc., 532 S.E. 2d 756 (Ga. Ct. App. 2000) ..................................... 32

Brake v. Tavormina (In re Beverly Mfg. Corp.), 841 F.2d 365 (11th Cir. 1988) .......................... 3

BSD Bancorp., Inc. v. Fed. Deposit Ins. Corp. (In re BSD Bancorp, Inc.), No. 94-
    1341-IEG (S.D. Cal. Feb. 28, 1995) ................................................................. 8, 9, 14

Bush v. Balfour Beatty Bahamas, Ltd. (In re Bush), 62 F.3d 1319 (11th Cir. 1995) .................... 3

Christensen v. Harris County, 529 U.S. 576 (2000) ....................................................... 24

Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.), 159 B.R. 9
    (Bankr. D. Kan. 1993), aff'd, 182 B.R. 859 (D. Kan. 1995) ................................. 11, 18, 20, 34

In re Exec. Tech. Data Sys., 79 B.R. 276 (Bankr. E.D. Mich. 1987) ..................................... 30, 32

In re U.S. Golf Corp., 639 F.2d 1197 (5th Cir. 1981) ...................................................... 3

Jump v. Manchester Life & Cas. Mgmt. Corp., 579 F.2d 449 (8th Cir. 1978) ...................... 10, 28

Krzalic v. Republic Title Co., 314 F.3d 875 (7th Cir. 2002) ........................................... 24

Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n, 869 F.2d 719
    (3d Cir. 1989) ................................................................................................ 24

Lubin v. Fed. Deposit Ins. Corp., No. 1:10-CV-00874, 2011 WL 825751 (N.D.
    Ga. Mar. 2, 2011) ...................................................................................... 21, 22

Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc.
    (In re TOUSA, Inc.), 406 B.R. 421 (Bankr. S.D. Fla. 2009) ............................... 23, 32

Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman
    Transp. Enters., Inc.), 744 F.2d 293 (2d Cir. 1984) .................................................. 15

Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs.. Corp. (In re
    Rudaw/Empirical Software Prods. Ltd)., 83 B.R. 241 (Bankr. S.D.N.Y. 1988) .......... 30, 31, 32

Seidman v. Office of Thrift Supervision, Dep't of Treasury (In re Seidman), 37
    F.3d 911 (3d Cir. 1994) ................................................................................. 24

Slobodinsky v. Salkin (In re Saber), 264 F.3d 1317 (11th Cir. 2001) ............................... 2

Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.), 269
    B.R. 481 (Bankr. E.D.N.Y. 2001), aff'd, 377 F.3d 209 (2d Cir. 2004)10, 11, 15, 16, 17, 18, 20, 23, 28, 34

Team Fin., Inc. v. Fed. Deposit Ins. Corp. (In re Team Fin., Inc.), Adv. No. 09-
    5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010) ................... 10, 18, 19, 20, 21, 28, 34

Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294 (11th Cir. 2007).................................... 30, 32

Vietnam Veterans of Am. v. Sec'y of Navy, 843 F.2d 528 (D.C. Cir. 1988).............................. 24

W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.),
    473 F.2d 262 (9th Cir. 1973) ............................................................................... 11, 20

Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.), 898 F.2d 1544 (11th
    Cir. 1990) ...................................................................................................................... 3

**Statutes**

11 U.S.C. § 365 ...................................................................................................................... 31

11 U.S.C. § 541(a)(1) ............................................................................................................ 12

12 C.F.R. § 571.7(b) .............................................................................................................. 24

12 U.S.C. § 371c .............................................................................................................. 28, 29

26 C.F.R. § 1.1502-77(a) ................................................................................................. 10, 28

26 U.S.C. § 1504(a) ................................................................................................................. 4

26 U.S.C. § 6611 ..................................................................................................................... 7

28 U.S.C. § 158(a)(1) .............................................................................................................. 1

63 Fed. Reg. 64757, 1998 WL 804364 (Nov. 23, 1998) .................................................. 23, 26

Fed. R. Bankr. P. 8013 ............................................................................................................ 3

Local Rule 3.01(j) .................................................................................................................... 2

US2008 2210243.8

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The above-captioned matter is presently before this Court on appeal from the (a) Order

Granting Plaintiff's Motion for Summary Judgment and Denying Defendant's Motion for

Summary Judgment, entered on September 30, 2010 [ECF No. 64] (App. 1)[1] (the "Summary

Judgment Order"); (b) Order Regarding Motion to Amend or Make Additional Findings of Fact

with Regard to Order Granting Plaintiff's Motion for Summary Judgment and Denying

Defendant's Motion for Summary Judgment, and Amend or Alter Judgment in Favor of Plaintiff,

entered on December 1, 2010 [ECF No. 86] (App. 2) (the "Amended Summary Judgment

Order"); and (c) related Judgment, entered on September 30, 2010 [ECF No. 65] (App. 3) (the

"Judgment," and, together with the Summary Judgment Order and the Amended Summary

Judgment Order, the "Summary Judgment Decision") by the United States Bankruptcy Court for

the Middle District of Florida (the "Bankruptcy Court").  The Summary Judgment Decision

constituted a final adjudication of all the issues raised in the declaratory judgment and turnover

action filed by Clifford Zucker, in his capacity as liquidating supervisor (the "Liquidating

Supervisor") for NetBank, Inc. (the "Debtor" or "Holding Company"), as Adversary Proceeding

No. 3:08-ap-00346-JAF (the "Tax Refund Action") regarding the ownership of a tax refund.  On

November 13, 2010, a notice of appeal was filed by the Federal Deposit Insurance Corporation

(the "FDIC"), and on December 9, 2010, an amended  notice of appeal was filed by the FDIC.

This Court has jurisdiction to "hear appeals from final judgments, orders and decrees . . . of

bankruptcy judges."  28 U.S.C. § 158(a)(1).  Because the Summary Judgment Decision

constituted a final adjudication of all issues raised in the Tax Refund Action, it constitutes a

---

[1]     "ECF No. __" indicates a reference to docket entries in Adversary Proceeding No. 3:08-ap-00346-JAF, Zucker v. FDIC, (Bankr. M.D. Fla.).  An appendix is being filed with this brief.  The Liquidating Supervisor refers to items in the adversary proceeding by bankruptcy court docket number and page number with reference to the location in the Appendix (where applicable), e.g., "[ECF No. __ at p. __] (App. __)."

"final judgment" from which an appeal may be taken as a matter of right.  See Slobodinsky v.

Salkin (In re Saber), 264 F.3d 1317 (11th Cir. 2001).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.01(j) of the Local Rules of the United States District Court for

the Middle District of Florida, the Liquidating Supervisor requests oral argument in connection

with this appeal.  The Liquidating Supervisor estimates that approximately one hour will be

required for oral argument.

## STATEMENT OF THE ISSUES PRESENTED

The Liquidating Supervisor submits that the issues presented by this appeal are (1)

whether the Bankruptcy Court correctly determined that the Tax Sharing Agreement[2] created a

debtor-creditor relationship between the Debtor and the Bank with respect to tax attributes, such

that the Tax Refund was property of the Debtor's estate at the time of the Chapter 11 filing, and

(2) whether the Bankruptcy Court correctly determined that, even if the Tax Sharing Agreement

was an executory contract that was rejected pursuant to the Debtor's Plan, the rejection did not

affect the Debtor's right to receive the Tax Refund because such right vested in the Debtor prior

to its Chapter 11 filing.

## APPLICABLE STANDARD OF APPELLATE REVIEW

Determinations left to the sound discretion of the bankruptcy court may be reversed on

appeal only when there is plain error or abuse of discretion.  "Such an abuse can occur only

'when the bankruptcy judge fails to apply the proper legal standard or to follow proper

procedures in making the determination, or bases an award upon findings of fact that are clearly

---

[2] Capitalized terms used in this paragraph regarding Statement of the Issues Presented that have not been defined heretofore have the meaning ascribed to them later in this brief.

erroneous.'" Brake v. Tavormina (In re Beverly Mfg. Corp.), 841 F.2d 365, 369 (11th Cir. 1988)

(quoting In re U.S. Golf Corp., 639 F.2d 1197, 1201 (5th Cir. 1981)).  In reviewing an order of a

bankruptcy court, an appellate court must accept the bankruptcy court's findings of fact with

respect to a core matter unless they are clearly erroneous.  See Bush v. Balfour Beatty Bahamas,

Ltd. (In re Bush), 62 F.3d 1319, 1322 (11th Cir. 1995); Federal Rule of Bankruptcy Procedure

8013.  The standard of review with respect to determinations of law made by the bankruptcy

court is de novo.  Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.), 898 F.2d 1544, 1548

n.1 (11th Cir. 1990).

## STATEMENT OF THE CASE

### The Bankruptcy Case

On September 28, 2007 (the "Petition Date"), the Debtor filed its voluntary petition for

relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") with the

Bankruptcy Court.  The Debtor subsequently filed a Chapter 11 plan of liquidation (the "Plan")

which the Bankruptcy Court confirmed on September 16, 2008.  Pursuant to the Plan, Clifford

Zucker was appointed as the Liquidating Supervisor for the Debtor.  The Liquidating Supervisor

is now the representative of the Debtor's bankruptcy estate, and, as a result, is authorized to

investigate and, if necessary, prosecute, any causes of action belonging to the Debtor or its

estate.

The Debtor was the ultimate parent corporation of a number of wholly-owned direct and

indirect subsidiaries.  Among the subsidiaries owned directly by the Debtor was NetBank, f.s.b.,

a federal savings bank (the "Bank"), which, in turn, owned the stock of several subsidiaries.  The

Debtor and its direct and indirect subsidiaries, including the Bank and the Bank's subsidiaries,

are collectively referred to in this brief as the "Consolidated Group."  The Bank and its

subsidiaries are collectively referred to in this brief as the "Bank Affiliated Group."  Before its

seizure in the fall of 2007, the Bank operated under the oversight of the Office of Thrift

Supervision (the "OTS"), the quasi-governmental entity that is charged with regulatory oversight

of federal savings banks.  On September 28, 2007, the OTS closed the Bank and appointed the

FDIC as receiver for the Bank.  That same day, the Debtor filed its Chapter 11 case in the

Bankruptcy Court.

**The Tax Sharing Agreement**

The Debtor and the other members of the Consolidated Group, including the Bank and

the other members of the Bank Affiliated Group, are parties to an Amended and Restated Tax

Sharing Agreement, effective January 1, 2003 (the "Tax Sharing Agreement"), which, in

addition to conferring on the Debtor complete control over tax reporting, tax administration and

the resolution of disputes with taxing authorities for the Consolidated Group, defines the

methods by which tax liabilities and credits are allocated among the members of the

Consolidated Group and paid.  Plaintiff's Motion for Summary Judgment (the "Summary

Judgment Motion")  [ECF No. 49, Exhibit A] (App. 4).[3]  As stated in the Tax Sharing

Agreement, and within the meaning of section 1504(a) of the Internal Revenue Code, the Debtor

is the common parent of the Consolidated Group, including the Bank Affiliated Group.  Tax

Sharing Agreement at p. 1.  See 26 U.S.C. § 1504(a).

On or about September 5, 2006, the Debtor filed a consolidated tax return for the

tax year ending December 31, 2005 (the "2005 Tax Return").  See Exhibit B to Summary

Judgment Motion (App. 5).  As shown on the 2005 Tax Return, the Consolidated Group had

taxable income of $17,987,259 and tax liability of $6,145,415.  On or about August 31, 2007, in

---

[3] The Tax Sharing Agreement, which is Exhibit A to the Summary Judgment Motion filed by the Liquidating
Supervisor, is included in the appendix to this brief as App. 4, rather than the Summary Judgment Motion itself.

US2008 2210243.8

accordance with Section 9 of the Tax Sharing Agreement, the Debtor filed a consolidated tax return for the tax year ending December 31, 2006 (the "2006 Tax Return"). See Exhibit C to Summary Judgment Motion (App. 6). As shown on the 2006 Tax Return, the Consolidated Group had a net operating loss of $94,128,552. Therefore, the Consolidated Group had zero tax liability for 2006. In accordance with the Tax Sharing Agreement, on September 4, 2007, the Debtor filed a Form 1139 for the tax year ending December 31, 2006, seeking a refund of $5,735,176 attributable to the carryback of the Consolidated Group's net operating loss incurred for its tax year ending December 31, 2006 to its tax year ending December 31, 2005 (the "Tax Refund"). See Exhibit D to Summary Judgment Motion (App. 7).

On or about November 26, 2007 (after the Petition Date), the FDIC, as receiver for the Bank, filed its own Form 1139, requesting that the Internal Revenue Service (the "IRS") remit the Tax Refund to the FDIC.[4] See Exhibit E to Summary Judgment Motion (App. 8). By letter dated February 11, 2008, the FDIC, as receiver for the Bank, attempted to repudiate and disaffirm the Tax Sharing Agreement. See Exhibit F to Summary Judgment Motion (App. 9). On or about March 10, 2008, the Debtor sent a letter to the IRS informing the IRS that the Tax Refund was property of the Debtor's estate, which should be paid to the Debtor and not the FDIC. See Exhibit G to Summary Judgment Motion (App. 10). On or about April 23, 2008, the IRS informed the Debtor and the FDIC that neither party's Form 1139 could be processed because, pursuant to IRS regulations, an application for a carryback adjustment was required to be signed by both the Debtor, as the common parent of the Consolidated Group, and the FDIC, as the fiduciary for the Bank. Subsequently, on or about June 11, 2008, the Debtor filed an amended consolidated tax return on behalf of the Consolidated Group for the tax year ending

---

[4] Technically, tax refunds are paid by the United States Treasury rather than the IRS. For simplicity, however, this brief will refer to tax refunds as if they are payable by the IRS.

US2008 2210243.8

December 31, 2005, clarifying the calculation of the Tax Refund and seeking payment of the same from the IRS.  See Exhibit H to Summary Judgment Motion (App. 11).  Thereafter, on or about June 18, 2008, the FDIC filed an amended tax return for the tax year ending December 31, 2005, on behalf of the Bank and its subsidiaries, once again erroneously claiming ownership of the Tax Refund.  See Exhibit I to Summary Judgment Motion (App. 12).

**Alleged Rejection of Tax Sharing Agreement**

The FDIC alleges that the Tax Sharing Agreement is an executory contract that was rejected pursuant to the Debtor's Plan.[5]

**The Adversary Proceeding**

On October 23, 2008, the Liquidating Supervisor filed his Complaint Under Sections 541 and 542 of the Bankruptcy Code Seeking a Declaratory Judgment Regarding Ownership of a Certain Tax Refund and Turnover of Property of the Bankruptcy Estate [ECF No. 1] (the "Complaint"), thereby initiating an adversary proceeding against the FDIC and the United States of America, acting through the IRS.  In Count I of the Complaint, the Liquidating Supervisor sought a declaratory judgment that the Tax Refund is property of the Debtor's bankruptcy estate pursuant to section 541(a) of the Bankruptcy Code.  In Count II of the Complaint, the Liquidating Supervisor requested that the Bankruptcy Court require the IRS to turn over the Tax Refund to the Liquidating Supervisor for the benefit of the Debtor's bankruptcy estate in accordance with section 542(a) of the Bankruptcy Code.  In accordance with a consent order, entered on February 19, 2009, the IRS was dismissed from the adversary proceeding and,

---

[5] The Bankruptcy Court, for purposes of its decision, assumed without deciding that the Tax Sharing Agreement was an executory contract on the Petition Date that remained in effect on the effective date of the Plan and, therefore, was rejected under the Plan.  The Bankruptcy Court did not believe that a finding that the Tax Sharing Agreement had been rejected under the Plan would alter its decision.

pursuant thereto, the IRS remitted the Tax Refund to the FDIC to be held in escrow.[6]  Consent

Order Granting United States of America's Motion to Dismiss (the "Consent Order") [ECF No.

35].  By check dated March 6, 2009, the IRS remitted the total amount of $6,213,576.86,[7] which

was placed in an interest-bearing escrow account in accordance with the terms of the Consent

Order and a supplemental consent order, entered on March 16, 2009.  Supplemental Consent

Order Granting United States of America's Motion to Dismiss [ECF No. 40].

In connection with competing summary judgment motions filed by the Liquidating

Supervisor and the FDIC, the Bankruptcy Court entered the Summary Judgment Decision

determining that the Tax Refund is property of the Debtor's estate and requiring that it be turned

over to the Liquidating Supervisor.  The FDIC has appealed the Summary Judgment Decision.

## PRELIMINARY STATEMENT

In its arguments below, the FDIC urged the Bankruptcy Court to be guided in its decision

by the **economic reality** of the Tax Sharing Agreement.  Defendant Federal Deposit Insurance

Corporation's Motion for Summary Judgment, filed on December 14, 2009 [ECF No. 46 at p. 20,

p. 22]; Defendant Federal Deposit Insurance Corporation's Response to Plaintiff's Motion for

Summary Judgment, filed on January 29, 2010 [ECF No. 52 at p. 9, p. 17]; Defendant Federal

Deposit Insurance Corporation's Reply to Plaintiff's Response to Defendant's Motion for

Summary Judgment, filed on February 22, 2010 [ECF No. 56 at pp. 6-7].  The Bankruptcy Court

followed that approach, and, after carefully considering the terms of the Tax Sharing Agreement,

concluded that the economic reality of the agreement was the creation of a debtor-creditor

---

[6] The consent order provides that neither the payment by the IRS to the FDIC, nor the deposit of the Tax Refund by the FDIC into escrow, would have any effect on the determination of the ultimate ownership of the Tax Refund.

[7] The difference between the amount of the requested Tax Refund and the amount tendered by the IRS is apparently attributable to the interest earned on the Tax Refund.  See 26 U.S.C. § 6611.

US2008 2210243.8

relationship between the Holding Company and the Bank with respect to tax attributes, pursuant to which (i) the Tax Refund constitutes property of the Holding Company's bankruptcy estate and (ii) the FDIC, as receiver for the Bank, is a creditor of the estate with respect to amounts equal to tax refunds that would have been due from the IRS to the Bank Affiliated Group if it had filed separate tax returns for tax years 2005 and 2006.

Having suffered the consequences of a decision firmly grounded on the economic reality of the Tax Sharing Agreement, the FDIC no longer touts that feature of the agreement as outcome determinative or even significant.  Instead, as described more specifically in the Argument section of this brief, it paraphrases the Tax Sharing Agreement, using language it wishes appeared in the agreement, and mischaracterizes the decision of the Bankruptcy Court as being predicated on a deemed loan of the Tax Refund by the Bank to the Holding Company.

Distilled to its essence, the FDIC's position is that no matter the structure or economic reality of a tax sharing agreement among a consolidated group of companies, a tax refund attributable to the earnings history of a member of the group belongs to that member unless the agreement expressly states that refunds belong to the parent.[8]  This position is squarely contrary to the very authority upon which the FDIC relies.  See, e.g., BSD Bancorp., Inc. v. Fed. Deposit Ins. Corp. (In re BSD Bancorp, Inc.), No. 94-1341-IEG (S.D. Cal. Feb. 28, 1995) at 10 (FDIC Brief, Addendum F) (recognizing that a tax allocation agreement may "expressly or **impliedly**" create a debtor-creditor rather than a principal-agent relationship between a common parent and a member of a consolidated group with respect to tax attributes) (emphasis added).

---

[8] See, e.g., Brief of Appellant Federal Deposit Insurance Corporation (hereinafter, "FDIC Brief"), p. 20 ("Nothing in the [Tax Sharing] Agreement expresses intent to give the Holding Company any beneficial interest with respect to [tax refunds].").

As the district court in the <u>BSD Bancorp</u> case observed, in deciding whether a transaction is intended to create a debtor-creditor relationship, a court must examine the economic reality of the transaction.  <u>Id.</u> at 10-11.  In this case, the Bankruptcy Court did just that and concluded correctly that, under the terms of the Tax Sharing Agreement, the Holding Company, not the IRS, was the obligor to the Bank with respect to amounts equal to refunds to which the Bank Affiliated Group would be entitled if it had filed separate tax returns.  Summary Judgment Order at p. 28.  Because the Holding Company was obligated to the Bank for such amounts under the agreement regardless of whether the Consolidated Group was receiving a refund, the Holding Company did not act as a collection agent for the members of the group with respect to tax refunds.  On the contrary, the relationship established under the Tax Sharing Agreement between the Holding Company and the Bank with respect to refunds to which the Bank Affiliated Group would be entitled if filing separately was a debtor-creditor relationship, and tax refunds payable by the IRS constituted property of the Holding Company.  Thus, the FDIC's argument that the relationship between the Holding Company and the Bank under the Tax Sharing Agreement with respect to tax attributes is a trustee-beneficiary relationship properly was rebuffed by the Bankruptcy Court.

The FDIC's fall-back argument based on alleged rejection of the Tax Sharing Agreement is similarly unavailing.  Even if the Tax Sharing Agreement was rejected in the Debtor's bankruptcy case, such rejection would not affect the nature of the Tax Refund as property of the estate.  Rejection is not the equivalent of rescission, and property rights that vest under an executory contract before it is rejected are unaffected by the rejection.  The Bankruptcy Court's determination that the Tax Refund is property of the Debtor's estate should be affirmed.

US2008 2210243.8

## ARGUMENT

**A.**  **The Tax Sharing Agreement governs the rights of the parties thereto regarding tax matters and establishes a debtor-creditor relationship between the Debtor and the Bank.  Accordingly, the Tax Refund is property of the Debtor's bankruptcy estate.**

This appeal arises out of a dispute between the Liquidating Supervisor, as representative of the Debtor's estate, and the FDIC, as receiver for the Bank, over entitlement to a federal income tax refund due to the Consolidated Group because of the carryback of net operating losses from one tax year to an earlier tax year in which the Consolidated Group had taxable income and paid taxes.  The Debtor, as the common parent of the Consolidated Group, filed consolidated income tax returns for the group in accordance with the provisions of the Tax Sharing Agreement.  Neither the Internal Revenue Code nor the regulations thereunder address entitlement, as among the members of a consolidated group, to a tax refund due to the consolidated group.  Although 26 C.F.R. § 1.1502-77(a) provides that the common parent is the agent for each subsidiary in the consolidated group, this agency relationship is for the convenience and protection of the IRS only and has no bearing on to which member or members of a consolidated group a tax refund belongs.  See Jump v. Manchester Life & Cas. Mgmt. Corp., 579 F.2d 449, 452 (8th Cir. 1978) ("[T]his agency relationship is for the convenience and protection of IRS only and does not extend further."); Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.), 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), aff'd, 377 F.3d 209 (2d Cir. 2004) (the agency provided for under 26 C.F.R. § 1.1502-77(a) "is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S."); Team Fin., Inc. v. Fed. Deposit Ins. Corp. (In re Team Fin., Inc.), Adv. No. 09-5084, 2010 WL 1730681, at *6 (Bankr. D. Kan. Apr. 27, 2010) (concluding the regulation simply makes "the common parent of the affiliated entities 'the

spokesman' for the group [to] ensure that the IRS can efficiently deal with only one member of the Consolidated Tax Group . . . .").

Given that the rights of members of a consolidated tax group with respect to a tax refund and other tax matters are not addressed in the Internal Revenue Code or the regulations thereunder, members are free to enter into an agreement that determines and allocates such rights.  When members of a consolidated tax group do in fact enter into a tax allocation or tax sharing agreement (as the Debtor and the Bank did in this instance), that agreement governs the issue of ownership of a tax refund and the parties' rights with respect thereto.[9]  See First Cent. Fin. Corp., 269 B.R. at 490 ("As a matter of state corporation law, parties are free to allocate among themselves their ultimate tax liability by an express agreement, or by a clearly implied agreement.  **The agreement will control the members' rights** in the absence of overreaching or breach of fiduciary duty.")  (citations omitted) (emphasis added); Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.), 159 B.R. 9, 29 (Bankr. D. Kan. 1993), aff'd, 182 B.R. 859 (D. Kan. 1995).  Here, the Debtor and its subsidiaries, including the Bank, entered into the Tax Sharing Agreement.  The Bankruptcy Court examined the Tax Sharing Agreement and correctly determined that it created a debtor-creditor relationship, rather than a trustee-beneficiary relationship, between the Debtor and the Bank with respect to tax attributes of the Bank Affiliated Group.  Because, under the economic reality of the Tax Sharing Agreement, the Debtor is an obligor to the Bank with respect to the tax attributes of the Bank Affiliated Group

---

[9] The FDIC relies heavily on Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.), 473 F.2d 262 (9th Cir. 1973), in which the court held that, **in the absence of a tax allocation or tax sharing agreement** among the members of an affiliated group of companies that file income tax returns on a consolidated basis, a tax refund belongs to the member to whose earnings history the refund is attributable.  The court in Bob Richards made it clear, however, that when an express or implied tax allocation agreement exists, the agreement will govern the issue of ownership of a tax refund. Id. at 264-65.  In short, Bob Richards itself recognizes that the default rule regarding ownership of  a tax refund does not come into play when the members of a consolidated group have entered into a tax allocation agreement.

rather than an agent/trustee, the Tax Refund belongs to the Debtor and is property of the estate pursuant to section 541 of the Bankruptcy Code.[10]

### 1.   The Structure of the Tax Sharing Agreement

In concluding that the Tax Sharing Agreement created a debtor-creditor relationship between the Debtor and the Bank, the Bankruptcy Court reviewed various provisions of that document.[11]  For example, Section 4(e) of the Tax Sharing Agreement provides:

> If the Bank Affiliated Group incurs a net operating loss, a net capital loss or is entitled to credits against tax as described above in this Section, **the amount payable to the Bank Affiliated Group by NetBank**[12] shall be no less than the amount the Bank would have received as a separate entity (including its subsidiaries), **regardless of whether the consolidated group is receiving a refund**.

Tax Sharing Agreement at p. 6, § 4(e) (App. 4) (emphasis added).

Similarly, Section 10(a) of the Tax Sharing Agreement provides in relevant part:

> Should the Bank Affiliated Group incur a tax loss, it should receive a refund from NetBank in an amount no less than the amount the Bank Affiliated Group would have received as a separate entity, **regardless of whether the NetBank consolidated group is receiving a refund**.

Tax Sharing Agreement at p. 8, § 10(a)(iii) (App. 4) (emphasis added).

As these provisions of the Tax Sharing Agreement clearly illustrate, the Bank's right to receive payment from the Debtor in respect of a tax refund is not dependent on receipt by the

---

[10] Section 541(a)(1) of the Bankruptcy Code provides that property of the estate is comprised of "all legal or equitable interests of the debtor in property" as of the bankruptcy filing.  11 U.S.C. § 541(a)(1).

[11] The FDIC seeks unsuccessfully to attribute the Bankruptcy Court's determination that the Tax Sharing Agreement created a debtor-creditor relationship between the Debtor and the Bank with respect to tax attributes principally to the absence of provisions in the agreement requiring the escrow, segregation or restriction on the use of tax refunds in the hands of the Debtor.  FDIC Brief, pp. 12-13.  This attempt simply ignores the fact that, as is apparent from its opinion, the Bankruptcy Court carefully considered the express language of a number of provisions in the Tax Sharing Agreement, not just the absence of provisions restricting the use of refunds, in reaching its conclusion.

[12] In the preamble of the Tax Sharing Agreement, the Debtor (NetBank, Inc.) is defined as "NetBank."  Tax Sharing Agreement at p. 1, Preamble (App. 4).

12

Debtor of a refund from the IRS or the Debtor even being entitled to receive such a refund. Rather, regardless of whether the Debtor receives or is entitled to receive a refund from the IRS based on a consolidated return, if the Bank Affiliated Group would have been entitled to a tax benefit if it had filed a separate return, then the Debtor is obligated under the Tax Sharing Agreement to pay the **amount of** such benefit to the Bank.  In short, the Debtor's obligations to the Bank with respect to tax attributes are not triggered by the Debtor's receipt of a tax refund but by the fact that the Bank Affiliated Group would have been entitled to a refund from the taxing authority if it had filed separately.  This structure is the very essence of  a debtor-creditor relationship between the Debtor and the Bank.

Further support for the position that the relationship between the Debtor and the Bank with respect to tax refunds is that of debtor-creditor, and not trustee-beneficiary, is found in Section 9 of the Tax Sharing Agreement.  Under that section, the Debtor is given complete discretion with respect to tax attributes of the Consolidated Group to determine whether to seek a refund from the IRS **or instead have applied, as a credit against the tax liability of the Consolidated Group**, the amount to which the Debtor is entitled in respect of such tax attributes.  Tax Sharing Agreement at p. 7, § 9(c) (App. 4).  Thus, if the Consolidated Group is entitled to receive a refund, the Debtor has the right, in its discretion, to elect to have such refund amount applied to payment of a subsequent year's taxes.  Having the right under the Tax Sharing Agreement to elect to receive a credit rather than a refund from the IRS is completely inconsistent with the notion that the Debtor somehow held rights to refunds in trust or as an agent for the benefit of the Bank or any other member of the Consolidated Group or that the Bank had a beneficial interest in tax refunds under the Tax Sharing Agreement.

13

The Bankruptcy Court declined to find that Section 9(c) of the Tax Sharing Agreement, **in and of itself**, established a debtor-creditor relationship between the Debtor and the Bank. Summary Judgment Order at pp. 25-26 (App. 1).  In distinguishing the Tax Sharing Agreement in this case from the tax sharing agreement in the BSD Bancorp case, however, the Bankruptcy Court did find the Debtor's power to elect to receive a credit in lieu of a tax refund germane to an assessment of the economic reality of the Tax Sharing Agreement.  In this regard, the Bankruptcy Court stated:

> Moreover, based on the provisions of the agreement described in the [BSD Bancorp] opinion, it does not appear that the agreement authorized the parent corporation, in its sole discretion, to decide whether to seek a refund from the IRS or, instead, have the amount of an overpayment applied as a credit against the tax liability of the consolidated group.  Finally, there is no indication in the [BSD Bancorp] opinion that the tax allocation agreement explicitly required payment by the parent to the subsidiary regardless of whether the consolidated group was receiving a refund.  In contrast, the provisions of the Tax Sharing Agreement that establish the debtor-creditor relationship between the Debtor and the Bank are not vague.  In view of these provisions, the economic reality under the Tax Sharing Agreement is that the Debtor has the power to decide whether even to seek a refund or, instead, to have an overpayment applied as a credit to the tax liability of the Consolidated Group. Whether or not the Debtor seeks a refund, and whether or not the Debtor receives a refund, it is obligated to pay the Bank an amount equal to the amount the Bank would have received if the Bank Affiliated Group had filed a separate return.  The economic reality of this transaction is that the Debtor, not the IRS, is the Bank's obligor and that a debtor-creditor relationship was created between the Debtor and the Bank under the Tax Sharing Agreement with respect to the tax attributes of the Bank Affiliated Group.

Summary Judgment Order at p. 28 (App. 1).

In finding that the Tax Sharing Agreement did not establish a trustee-beneficiary relationship between the Debtor and the Bank, the Bankruptcy Court also considered the absence of any provision in the Tax Sharing Agreement (i) requiring that any tax refunds be placed in

US2008 2210243.8

escrow after receipt by the Debtor and pending any payment to the Bank, (ii) requiring that any tax refunds be segregated after receipt by the Debtor and prior to any payment to the Bank, or (iii) imposing any restrictions on the Debtor regarding use of refund money between the date of receipt by the Debtor-parent and the date of any payment to the Bank-subsidiary.  The Bankruptcy Court recognized that the lack of inclusion of any such provisions in the Tax Sharing Agreement undercut the FDIC's argument that a principal-agent relationship had been created because the Debtor did not act subject to the direction and control of the Bank with respect to tax refunds under the agreement.  Summary Judgment Order at pp. 19-22 (App. 1).  See Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman Transp. Enters., Inc.), 744 F.2d 293, 295 (2d Cir. 1984).

In sum, the structure and content of the Tax Sharing Agreement provide ample grounds on which to conclude that the relationship created under the agreement between the Debtor and the Bank with respect to tax attributes of the Bank Affiliated Group is a debtor-creditor relationship.  The Bankruptcy Court's conclusion to that effect was correct, mandating its determination that the right to the Tax Refund became property of the Debtor's estate on the Petition Date.

## 2.    **Supporting Authority**

The Bankruptcy Court's interpretation of the Tax Sharing Agreement as creating a debtor-creditor relationship is also supported by applicable case law.  In Superintendent of Insurance v. First Central Financial Corp. (In re First Central Financial Corp.), 269 B.R. 481 (Bankr. E.D.N.Y. 2001), aff'd, 377 F.3d 209 (2d Cir. 2004), the bankruptcy court held that (1) the tax allocation agreement at issue in that case did not give rise to a trust or agency relationship between a common parent and its regulated insurance company subsidiary (which had been

15

placed into receivership) with respect to a tax refund, and (2) a constructive trust would not be imposed on the tax refund for the benefit of the subsidiary, even though most of the income and losses had been generated by the subsidiary. Id. at 495-502. There, the parent ("FCFC") and the subsidiary ("FCIC") had entered into a tax allocation agreement which prescribed how tax payments and refunds were to be apportioned between the two entities. Id. at 490. FCIC was the only member of the consolidated group to earn taxable income in 1994 and 1995, and, as a result, it paid the group's entire tax liability for those years. Id. at 486. The group as a whole and FCIC, on a stand alone basis, suffered losses in 1996 and 1997, which led to FCFC (the parent) applying for and receiving tax refunds from the IRS, the amounts of which it paid to FCIC pursuant to the tax allocation agreement. Id. In January 1998, FCIC became insolvent and was placed into receivership. In March 1998, FCFC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and the Chapter 11 case was later converted to Chapter 7 in April 1998. Id. at 485. Subsequently, the trustee for FCFC applied to the IRS for a refund of the taxes paid in 1994 and 1995 based upon the carryback of net operating losses for 1997. Id. at 486. The trustee claimed the $2.5 million refund as property of FCFC's bankruptcy estate. Id. at 487. The Superintendent of Insurance, as the Liquidator of FCIC, challenged the trustee's claim to the refund, contending that FCIC owned the beneficial interest in the refund.

The bankruptcy court considered the issue of whether, under the tax allocation agreement, "FCFC holds the Tax Refund as trustee for FCIC, or otherwise holds only bare legal title to the Tax Refund, such that the beneficial interest in the Tax Refund is not property of the estate." Id. at 490. The bankruptcy court answered that question in the negative and, in so doing, found several factors to be important. First, under the terms of the tax allocation agreement, FCIC would only be entitled to a refund in an amount that it would have received

16

from the IRS had it filed its taxes on a stand-alone basis.  Id. at 495.  So, as is the case with the

Debtor's Tax Sharing Agreement with the Bank, the amount payable to FCIC in respect of a tax

refund would not necessarily correlate to the refund received by FCFC.  Second, the tax

allocation agreement (like the Tax Sharing Agreement) did not provide that "[the parent

corporation] holds any portion of the Tax Refund in trust for [the subsidiary] or contain any

language even purporting to create such a trust."  Id. at 496.  Third, like the Tax Sharing

Agreement, the tax allocation agreement contained no provision requiring tax refunds received

by the parent corporation to be placed in escrow, no requirement that the parent corporation

segregate any tax refund payment due to the subsidiary, and no restrictions on how the refund

monies might be used or invested.  Id.  Fourth, the tax allocation agreement simply required, in

connection with a tax refund, that an ultimate settlement payment be made to FCIC.  Id.  This is

similar to the Tax Sharing Agreement which provides for payment to the Bank of whatever

amount of tax benefit it would have been entitled to receive if the Bank Affiliated Group had

filed a separate tax return.  Fifth, and finally, the tax allocation agreement in First Central

Financial Corp. (like the Tax Sharing Agreement) did not contain any language creating a true

agency relationship because "FCFC does not act at FCIC's direction and control, either in

applying for a tax refund, or in the handling of the refund monies once received."  Id. at 497.

    In rejecting the trustee-beneficiary characterization asserted by the Superintendent, the

bankruptcy court concluded that the parent corporation's obligations to make payments to the

subsidiary under the tax allocation agreement in respect of tax refunds created a debtor-creditor

relationship with ordinary contractual obligations between the parties, and not a fiduciary

relationship.  Id. at 497-98 (citations omitted).  ("[A]ny payment due to FCIC under the Tax

Allocation Agreement will be made by FCFC.  This provision is consistent with a debtor-creditor

US2008 2210243.8

relationship, as are the preceding and following sentences, which both provide for 'settlements' between the parties under the Agreement.").  Because there was no evidence of overreaching or breach of fiduciary duty in connection with creating and implementing the tax allocation agreement, the bankruptcy court found no basis to impose a constructive trust on the tax refund and enforced the agreement in accordance with its terms.  Id. at 500-01.  As a result, the court found that the tax refund was property of FCFC's bankruptcy estate.  Id. at 502.  The reasoning underlying the bankruptcy court's conclusion in the First Central Financial Corp. case that the tax refund constituted property of FCFC's estate under section 541 of the Bankruptcy Code is also applicable in this case and mandates a determination that the Tax Refund is property of the Debtor's estate, as the Bankruptcy Court properly concluded in its Summary Judgment Order.  See also Franklin Sav. Corp., 159 B.R. at 14-16, 29 (holding that the terminology employed in a tax reimbursement agreement among the members of a consolidated group demonstrated that the relationship between the parent corporation and the subsidiary bank with respect to tax refunds was a debtor-creditor relationship).

The decision last year in Team Financial, Inc. v. Federal Deposit Insurance Corp. (In re Team Financial, Inc.), Adv. No. 09-5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010) provides further support for the Bankruptcy Court's determination in this case that the Tax Sharing Agreement established a debtor-creditor relationship between the Debtor and the Bank with respect to tax attributes.  In Team Financial, the FDIC filed a motion for summary judgment, contending that any consolidated federal income tax refunds received by the debtors (three bank holding companies, one of which was the common parent of a consolidated tax group) were held by the debtors as agents or trustees for their failed bank subsidiaries because the refunds were attributable to the earnings of the failed banks.  Thus, according to the FDIC,

18

such refunds were not property of the debtors' bankruptcy estates.  Team Fin., 2010 WL

1730681, at *1, *4.  In response, the debtors asserted that the relevant tax allocation agreement

(the "TAA") governed the parties' rights with respect to such tax refunds, that the refunds

belonged to the debtors, and that the FDIC was simply an unsecured creditor of the debtors'

bankruptcy estates.  Id., at *4.

The Team Financial court first examined the TAA to determine whether the agreement

created an express trust.  Id.  The court determined that the TAA did not meet the necessary

requirements for an express trust under applicable state law and concluded that:

> [W]hile [the common parent] may have contractual obligations
> under the TAA in its handling or distribution of the tax refund,
> nothing in the TAA operates to elevate those duties to the level of an
> express trust nor designates [the common parent] or the debtors as
> trustees or agents for the affiliated entities in the Consolidated Tax
> Group.

Id., at *5.

The court then analyzed Treas. Reg. § 1.1502-77 and concluded that the regulation "does

not purport to decree who 'owns' the refund as between the parent and the members of the

group" but rather simply makes "the common parent of the affiliated entities 'the spokesman' for

the group [to] ensure that the IRS can efficiently deal with only one member of the Consolidated

Tax Group . . . ."  Id., at *6.  Accordingly, the court held that Treas. Reg. § 1.1502-77 does not

determine ownership of tax refunds or limit the common parent's interest in tax refunds to a bare

legal interest.  Id., at **6-7.  In other words, the regulation does not impose a trustee relationship

on the common parent with respect to any tax refunds received by the common parent on behalf

of the members of the consolidated group.  Id., at *8.

The court then considered what effect to give the TAA.  Initially, the court noted that

"[t]he parties to the TAA in this case made a 'differing agreement,' taking this case out of the

<u>Bob Richards</u> general rule." <u>Id.</u>  After analyzing the TAA, the court held that the tax refund at issue was property of the common parent's bankruptcy estate.  <u>Id.</u>, at *10.  In reaching this conclusion, the court relied on <u>Franklin Savings Corp.</u> and <u>First Central Financial Corp.</u>  The <u>Team Financial</u> court was "convinced that the unambiguous language of the TAA at issue here is as compelling as the language employed in the tax agreements in <u>Franklin Savings</u> and <u>First Central Financial Corp.</u> and a similar conclusion should obtain."  <u>Id.</u>, at *11.  Specifically, the court focused on those provisions of the TAA which imposed a contractual obligation upon the common parent debtor to "pay" certain amounts to the members of the consolidated group.  <u>Id.</u>  Therefore, the court ruled that:

> Nothing in the TAA creates a trust or agency relationship with respect to federal income tax refunds received by [the common parent debtor] from the IRS . . . . In short, the TAA creates "ordinary contractual obligations" between [the common parent debtor] and the members [of the consolidated group] with respect to tax liability and tax refunds.  [The common parent debtor] is indebted to members of the group with respect to tax overpayments and tax refunds in those amounts specified under the TAA.  As such, the relationship between [the common parent debtor] and its members with respect to the tax refund is that of debtor and creditor.  [The banks] may assert a claim against the estate for [the common parent debtor's] payment obligation under the TAA, but the tax refund is property of the estate.

<u>Id.</u>, at *11.  In reaching its conclusion that the TAA established a debtor-creditor relationship (and not a trustee or agency relationship), the court in <u>Team Financial</u> also observed that nothing in the TAA required the debtor to segregate the tax refund or hold the tax refund in trust for members of the consolidated group, and nothing in the TAA prohibited the debtor from using the tax refund.  <u>Id.</u>

The Tax Sharing Agreement provides an even stronger basis for a determination that tax refunds belong to the common parent than the tax agreements involved in the cases discussed

above.  For example, in <u>Team Financial</u>, the tax agreement did not require the holding company to make payments in respect of tax refunds to the subsidiary banks until the holding company received the refunds from the IRS.  <u>Id.</u>, at *3.  In contrast, under the Tax Sharing Agreement, the Bank's right to receive payment from the Debtor in respect of a tax refund is not dependent on receipt by the Debtor of a refund from the IRS or the Debtor even being entitled to receive a refund from the IRS.  Instead, regardless of whether the Debtor is entitled to receive a refund from the IRS based on a consolidated return, if the Bank Affiliated Group would have been entitled to a tax benefit if it had filed a separate return, then the Debtor has an independent obligation to pay the amount of such benefit to the Bank.  Tax Sharing Agreement at p. 6, § 4(e), p. 8, § 10(a)(iii) (App. 4).[13]  In sum, this case presents an even stronger case than the cases discussed above for holding that the tax agreement at issue establishes a debtor-creditor relationship between the holding company and the subsidiary bank with respect to tax refunds. The Bankruptcy Court correctly interpreted the Tax Sharing Agreement as creating such a relationship, mandating the conclusion that the Tax Refund belongs to the Debtor.

The recent decision in <u>Lubin v. Federal Deposit Insurance Corp.</u>, No. 1:10-CV-00874, 2011 WL 825751 (N.D. Ga. Mar. 2, 2011) is not at odds with the decision of the Bankruptcy Court in this case.  In <u>Lubin</u>, the District Court found that the language in the tax agreement at

---

[13] Implicitly recognizing that the language actually used in the Tax Sharing Agreement undermines its position, the FDIC paraphrases the agreement using words it wishes appeared in the agreement rather than the words that actually appear.  For example, the FDIC represents that "[t]he Agreement provides that the Holding Company **shall transfer** to the Bank the amount of any tax refund attributable to its losses, or that it would have received had it filed separately."  FDIC Brief, p. 6. (emphasis added).  It further characterizes the Tax Sharing Agreement as requiring that "[t]he Holding Company must **turn over** to the Bank any amounts due under [Section 4 of the agreement]."  <u>Id.</u> (emphasis added).  In connection with amounts due from the Holding Company to the Bank, however, the Tax Sharing Agreement does not speak in terms of "transfer" or "turn over."  Instead, it obligates the Holding Company to "pay" amounts due the Bank under the agreement and refers to amounts "payable to the Bank Affiliated Group by [the Holding Company] … regardless of whether the consolidated group is receiving a refund."  Tax Sharing Agreement at p. 4, § 3(d), p. 6, § 4(e) (App. 4).  The FDIC's paraphrasing of the words that appear in the agreement reveals its awareness that the words actually used in the agreement do not support its position that the Holding Company functions as an agent-trustee for the Bank under the agreement with respect to tax refunds issued by the IRS.

21

issue in that case clearly established a principal-agent relationship rather than a debtor-creditor relationship between the bank and the holding company with respect to tax refunds.  In reaching this conclusion, the court emphasized the following language that appeared in the tax agreement:

> If the Holding Company receives a tax refund from a taxing authority, these funds are obtained as agent of the consolidated group on behalf of the individual group members.  This allocation agreement as well as other corporate policies should not be intended to consider refunds attributable to the subsidiary banks, which are received by the Holding Company from the taxing authority, as the property of the Holding Company.

Id., at *5.

Given the express language in the tax agreement that refunds received by the Holding Company from taxing authorities were obtained as agent of the consolidated group on behalf of the individual group members and the disclaimer by the Holding Company of ownership of refunds attributable to the subsidiary banks, it is not surprising that the court found that an agency relationship was intended under the tax agreement with respect to refunds, not a debtor-creditor relationship.

The Lubin case is clearly distinguishable from the instant case.  The Tax Sharing Agreement does not provide that refunds from taxing authorities are received by the Holding Company as agent on behalf of the individual members of the Consolidated Group.  In addition, there is no expression of intent in the Tax Sharing Agreement that tax refunds not constitute the property of the Holding Company.  In short, there is no language in the Tax Sharing Agreement equivalent to the language emphasized by the court in Lubin, and the Lubin case does not support the FDIC's contention that the Bankruptcy Court erred in finding that the economic reality of the Tax Sharing Agreement was the creation of a debtor-

creditor relationship between the Holding Company and the Bank with respect to tax

attributes.

The beneficial interest in the Tax Refund vested in the Debtor no later than January 1,

2007, the first day of the Debtor's tax year immediately succeeding the tax year in which the

losses giving rise to the Tax Refund were incurred.  See Official Comm. of Unsecured Creditors

of TOUSA, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.), 406 B.R. 421, 432-33 (Bankr.

S.D. Fla. 2009) (holding that the debtor's right to a tax refund resulting from the carryback of net

operating losses incurred in 2007 to years 2006 and 2005 arose at 12:01 a.m. on January 1, 2008,

immediately after the conclusion of year 2007).  As a result, pursuant to Section 541(a)(1) of the

Bankruptcy Code, the Debtor's beneficial interest in and right to receive the Tax Refund, which

vested no later than January 1, 2007, became property of the estate on September 28, 2007 (the

Petition Date), when the Debtor filed its Chapter 11 case.  See First Cent. Fin. Corp., 269 B.R. at

495 ("[I]f, as the Trustee contends, [the holding company] and [the subsidiary] stand in a debtor-

creditor relationship with respect to any refund payment due and owing from [the holding

company] under the Tax Allocation Agreement, the beneficial interest in the Tax Refund is

property of the estate.").  Accordingly, the Bankruptcy Court's rulings that the Tax Refund is

property of the Debtor's bankruptcy estate and that the Tax Refund should be turned over to the

Liquidating Supervisor for the benefit of the Debtor's bankruptcy estate should be affirmed.

**B.      The Interagency Policy Statement does not affect the status of the Tax Refund as property of the Debtor's estate.**

In an effort to circumvent the economic reality of the Tax Sharing Agreement, the FDIC

relies heavily on the Interagency Policy Statement on Income Tax Allocation in a Holding

Company Structure, 63 Fed. Reg. 64757, 1998 WL 804364 (Nov. 23, 1998) (the "Policy

Statement"). First, it asserts that the Policy Statement "prohibits" the Holding Company from characterizing refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent. FDIC Brief, p. 12. This assertion vastly overstates the status of a policy statement because a policy statement does not have the effect of law and, accordingly is suggestive, not prohibitory. See Seidman v. Office of Thrift Supervision, Dep't of Treasury (In re Seidman), 37 F.3d 911, 931-32 (3d Cir. 1994) (holding that an OTS "Statement of Policy," set forth at 12 C.F.R. § 571.7(b), was not "regulation or law"). In fact, the Policy Statement has even less force than the statement of policy in Seidman, because the Policy Statement, unlike the statement of policy in Seidman, was never set forth in the Code of Federal Regulations. See Krzalic v. Republic Title Co., 314 F.3d 875, 881 (7th Cir. 2002) ("A simple announcement is too far removed from the process by which courts interpret statutes to earn deference. A simple announcement is all we have here. One fine day the policy statement simply appeared in the Federal Register. No public process preceded it …."); see also Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters–like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law–do not warrant Chevron-style deference."); Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n, 869 F.2d 719, 736 (3d Cir. 1989) (concluding that an agency's policy statement "is entitled to no greater deference than any other policy statement, i.e., none"); Vietnam Veterans of Am. v. Sec'y of Navy, 843 F.2d 528, 537 (D.C. Cir. 1988) ("A binding policy is an oxymoron."). It is also apparent from the face of the Policy Statement that it does not constitute a rule or regulation or have the force of law, but rather was issued "to provide guidance to banking organizations and savings associations regarding the allocation and payment of taxes among a

holding company and its subsidiaries," when a bank holding company and its subsidiaries file

consolidated group income tax returns.  Policy Statement at p. 64758.

Moreover, even if the Policy Statement could be deemed as having some legally coercive

effect (which the Liquidating Supervisor vigorously denies), it is not offended by the crafting of

a tax sharing agreement the economic reality of which is the establishment of a debtor-creditor

relationship between a holding company and its bank subsidiary with respect to tax attributes of

the bank.  The Policy Statement suggests that a tax allocation agreement should not purport to

characterize refunds attributable to a subsidiary depository institution that the parent receives

from a taxing authority as property of the parent.  Policy Statement at p. 64759.  The Tax

Sharing Agreement is compliant with that suggestion.  It does not purport to "characterize" tax

refunds as the property of any member of the Consolidated Group.  Instead, the ownership

determination is driven by the treatment of tax refunds set forth in the agreement, a treatment

which, ironically, is promoted by the Policy Statement.

In this regard, the Policy Statement provides in relevant part:

> An institution incurring a loss for tax purposes should record a current income tax benefit and receive a refund from its parent in an amount no less than the amount the institution would have been entitled to receive as a separate entity.  **The refund should be made to the institution within a reasonable period following the date the institution would have filed its own return, regardless of whether the consolidated group is receiving a refund**.  If a refund is not made to the institution within this period, the institution's primary federal regulator may consider **the receivable** as either an extension of credit or a dividend from the subsidiary to the parent.

Policy Statement at p. 64758.  (emphasis added).

As the language quoted above demonstrates, the Policy Statement effectively encourages

the structuring of tax sharing agreements in a manner that fosters the creation of debtor-creditor

25

relationships between bank holding companies and their bank subsidiaries with respect to losses incurred by the subsidiaries.  Under the structure promoted in the Policy Statement for tax allocation agreements, the obligor is the holding company, and not the IRS, with respect to tax refunds due to bank subsidiaries.  The holding company does not function as a collection agent or trustee, but rather is independently liable to its bank subsidiary for the amount to which the subsidiary would have been entitled had it filed separately, regardless of whether the consolidated group is receiving a refund from the IRS.  This quintessential debtor-creditor relationship was incorporated into the Tax Sharing Agreement, as suggested in the Policy Statement.  Tax Sharing Agreement, p. 6, § 4(e), p. 8, § 10(a)(iii) (App. 4).  If, as the Liquidating Supervisor contends, compliance with the Policy Statement's suggestions regarding the Holding Company's obligations to the Bank with respect to tax attributes resulted in the creation of a debtor-creditor relationship conferring ownership of the Tax Refund on the Holding Company, the FDIC is in no position to complain about the consequences.

The FDIC also contends that the reference to the Policy Statement in Section 10(a) of the Tax Sharing Agreement evidences the parties' intent to establish a trustee-beneficiary relationship under the agreement with respect to refunds received from taxing authorities.  The FDIC is wrong.  In a "Supplementary Information" section of the material in the Federal Register relating to the Policy Statement, the following language appears in relevant part:

> The interagency policy statement reaffirms that intercorporate tax settlements between an institution and the consolidated group should result in no less favorable treatment to the institution than if it had filed its income tax return as a separate entity.  Accordingly, …. an institution incurring a tax loss should receive a refund from its parent.  The refund should be in an amount no less than the amount the institution would have received as a separate entity, regardless of whether the consolidated group is receiving a refund.

63 Fed. Reg. 64757.

It is evident that the "no less favorable treatment" language quoted above, which is mirrored in Section 10(a) of the Tax Sharing Agreement, refers to the amount and timing of the payment from the parent to the subsidiary institution,[14] not to the capacity in which a refund from a taxing authority (which might or might not be forthcoming) is received by the parent.

It is in this context, namely, the amount and timing of payment to the Bank, that Section 10(a) of the Tax Sharing Agreement expresses an intent to conform to the Policy Statement.

Section 10(a) provides:

> This Agreement is intended to allocate the tax liability in accordance with the [Policy Statement]. Under this guidance, tax settlements between the Bank Affiliated Group and the NetBank consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity. Accordingly:
>
> (i) Tax remittances from the Bank Affiliated Group to NetBank for its current tax expense should not exceed the amount the Bank Affiliated Group would have paid had it filed separately.
>
> (ii) The tax payments by the Bank Affiliated Group to NetBank should not be made before the Bank Affiliated Group would have been obligated to pay the taxing authority had it filed as a separate entity.
>
> (iii) Should the Bank Affiliated Group incur a tax loss, it should receive a refund from NetBank in an amount no less than the amount the Bank Affiliated Group would have received as a separate entity, regardless of whether the NetBank consolidated group is receiving a refund.
>
> (iv) The Bank Affiliated Group should not pay its deferred tax liabilities or the deferred portion of its applicable income taxes to NetBank since these are not liabilities required to be paid in the current reporting period.

Tax Sharing Agreement p.8, § 10(a) (App. 4).

---

[14] The text of the Policy Statement, itself, reads: "Furthermore, the amount and timing of payments [by the subsidiary institution to the parent in respect of the institution's tax liability] or refunds [from the parent to the institution regardless of whether the consolidated group is receiving a refund] should be no less favorable to the subsidiary than if it were a separate taxpayer." Policy Statement at p. 64758. The Policy Statement goes on to provide that refunds from the parent should be made to the institution within a reasonable period following the date the institution would have filed its own return, regardless of whether the consolidated group is receiving a refund.

US2008 2210243.8

The "no less favorable treatment" language in Section 10(a) of the Tax Sharing Agreement clearly refers to the amount and timing of intercorporate payments between the Debtor and the Bank in respect of tax liabilities.  There is not a scintilla of evidence that Section 10(a) was intended to adopt the Policy Statement's view of the capacity in which a common parent of a consolidated group receives a tax refund from the IRS – a view predicated on a fundamental misunderstanding of the meaning of 26 C.F.R. § 1.1502-77(a), which refers to the common parent of a consolidated group as an agent solely for the convenience and protection of the IRS and has no bearing on to what member or members of a consolidated group a tax refund belongs.  <u>See</u> <u>Jump</u>, 579 F.2d at 452; <u>First Cent. Fin. Corp.</u>, 269 B.R. at 489; <u>Team Fin.</u>, 2010 WL 1730681, at *6.  The Bankruptcy Court correctly determined that Section 10(a) of the Tax Sharing Agreement expresses no intent to affirm a trustee/beneficiary relationship between the Debtor and the Bank with respect to tax refunds.  Summary Judgment Order at p. 31 (App. 1). Indeed, Section 10(a)(iii) of the Tax Sharing Agreement shows, to the contrary, that the economic reality of the Tax Sharing Agreement is the creation of a debtor-creditor relationship between the Debtor and the Bank with respect to tax attributes, fully supporting the Bankruptcy Court's ruling that the Tax Refund is property of the Debtor's estate.

**C.    The Debtor's independent contractual obligation under the Tax Sharing Agreement to pay the Bank the tax benefit amount to which it would have been entitled had the Bank Affiliated Group filed a separate tax return does not constitute a "loan" of tax refunds by the Bank to the Debtor in violation of 12 U.S.C. § 371c.**

The FDIC attempts to deflect the Court's attention from the real issues in this case by mischaracterizing the Bankruptcy Court's decision as based on a finding that the Tax Sharing Agreement authorized the Holding Company to borrow the Tax Refund from the Bank.  Having erected this straw man, the FDIC then seeks to demolish it by asserting that such a loan would

US2008 2210243.8

violate 12 U.S.C. § 371c, which places restrictions on extensions of credit by a member of the Federal Reserve System to an affiliate.

In fact, the Liquidating Supervisor has never contended that the debtor-creditor relationship created under the Tax Sharing Agreement arises from a right to borrow tax refunds from the Bank, and the Bankruptcy Court did not base its decision on a theory that the Tax Refund was loaned to the Holding Company.  The Bankruptcy Court found that, under the methodology employed in the Tax Sharing Agreement, tax refunds belong to the Holding Company.  The Holding Company would have no occasion to borrow property it already owns.

The Debtor's obligation to the Bank under the Tax Sharing Agreement with respect to tax attributes does not arise from borrowing a tax refund.  Instead, the Debtor's obligation to the Bank pursuant to the Tax Sharing Agreement is an independent contractual agreement to pay the Bank an amount equal to the amount to which the Bank Affiliated Group would be entitled if it filed separately, regardless of whether a refund is forthcoming from the IRS.

The Debtor's obligation to the Bank, as described above, does not arise from an extension of credit by the Bank to the Debtor.  Instead, it arises from an independent contractual commitment on the part of the Debtor to make payments in respect of tax attributes – a contractual commitment the Policy Statement advocates be made by bank holding companies pursuant to tax sharing agreements.  Policy Statement at p. 64758.  Section 371c of Title 12 is not implicated by the debtor-creditor relationship created under the Tax Sharing Agreement with respect to refunds.

**D.      The Tax Refund is property of the Debtor's estate even if the Tax Sharing Agreement was rejected pursuant to the Debtor's Plan.**

The FDIC argues that the Tax Sharing Agreement was an executory contract of the Debtor and that it was rejected pursuant to the Debtor's Plan.  It contends that, as a result of the alleged rejection, the Debtor is not entitled to the Tax Refund because the Tax Sharing Agreement is unenforceable by the Debtor. As an initial matter, it should be noted that the Bankruptcy Court did not actually make a determination in the Summary Judgment Order about whether the Tax Sharing Agreement was in fact an executory contract at the time of the Debtor's Chapter 11 filing or date of confirmation of the Plan.  Rather, for purposes of its decision, the Bankruptcy Court assumed that the Tax Sharing Agreement was an executory contract that was rejected pursuant to the Debtor's Plan. It then concluded that, even if the agreement had been rejected as alleged, such rejection would not affect the bankruptcy estate's ownership of the Tax Refund because rejection of an executory contract in bankruptcy is not tantamount to extinguishment, rescission, cancellation, or termination of the contract and does not affect property rights that vested before rejection.  See Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1307 (11th Cir. 2007) ("The rejection of a pre-petition executory contract pursuant to which the debtor acquired property does not obligate the debtor to return the property."); In re Exec. Tech. Data Sys., 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987) ("Property acquired prior to the filing of a petition in bankruptcy remains property of the estate regardless of whether the trustee or debtor in possession assumes or rejects the unperformed obligations of the contract pursuant to which the property was acquired.").

The Bankruptcy Court's decision also finds strong support in Rudaw/Empirical Software Products Ltd. v. Elgar Electronics. Corp. (In re Rudaw/Empirical Software Products Ltd)., 83 B.R. 241, 246 (Bankr. S.D.N.Y. 1988), a case in which the bankruptcy

court recognized that rejection is not the equivalent of rescission.  In <u>Rudaw</u>, prior to bankruptcy, the debtor entered into a "Software Purchase Agreement" pursuant to which it sold and transferred to the buyer the copyright and all associated rights in a software program.  Under the purchase agreement, the debtor and the buyer had continuing obligations to one another after the transfer, and the purchase agreement constituted an executory contract at the time the debtor filed for relief under Chapter 11.  <u>Id</u>. at 243.  The debtor filed a motion to reject the purchase agreement, and the motion was granted by the bankruptcy court.  <u>Id</u>. at 245.  The debtor then contended that the rights in the software program had reverted to it because, among other things, the purchase agreement had been rejected.  In rejecting the debtor's contention, the bankruptcy court explained:

> Pursuant to 11 U.S.C. § 365, a debtor in possession may assume or reject an executory contract or unexpired lease.  Rejection denies the right of the contracting creditor to require the debtor **to perform the executory portions** of the contract; limits the creditor's claim to damages for breach of contract, and prohibits a rejecting debtor from compelling the contracting creditor to perform its executory obligations.  However, the rejection of an executory contract pursuant to 11 U.S.C. § 365 **is not the equivalent of rescission**; the rejection does not obligate [the buyer] to return the Failsafe property it acquired as a result of the purchase which was not executory and therefore not subject to the debtor's rejection power.

<u>Id</u>. at 246 (emphasis added) (citations omitted).  Given that rejection is not the same as rescission, rights in property that have passed to a party to a contract before bankruptcy are not divested by rejection in bankruptcy even if the contract remains executory at the time of the bankruptcy filing.  <u>Id</u>.

As previously explained in this brief, the beneficial interest in the Tax Refund vested in the Debtor no later than January 1, 2007, the first day of the Debtor's tax year immediately succeeding the tax year in which the losses giving rise to the Tax Refund were incurred.  <u>See</u>

US2008 2210243.8

TOUSA, Inc., 406 B.R. at 432-33.  This occurrence was more than nine months before the Debtor's Chapter 11 filing.  As a result, the Debtor's legal and beneficial interests in the Tax Refund became property of the Debtor's estate on September 28, 2007 (the Petition Date), regardless of whether the Tax Sharing Agreement was an executory contract that was later rejected pursuant to the Plan.  Rejection of the Tax Sharing Agreement under the Debtor's Plan affected only such portions, if any, as remained executory.  It did not divest the Debtor's estate of its already established right to the Tax Refund.  See Thompkins, 476 F. 3d at 1307; Rudaw, 83 B.R. at 246; Exec. Tech. Data Sys., 79 B.R. at 282.

Not surprisingly, the FDIC has not cited a single case holding that an interest in property acquired before the filing of a bankruptcy case ceases to be property of the estate if the trustee or debtor in possession rejects the unperformed obligations of the contract pursuant to which the property was acquired.[15]  Instead, it seeks to circumvent the reasoning in the cases relied on by the Bankruptcy Court by again mischaracterizing the Bankruptcy Court's decision as based on a determination that the Debtor's ownership interest in the Tax Refund stems from the Debtor's alleged right to borrow the refund from the Bank after the refund is paid by the IRS.  FDIC Brief, pp. 24, 25.

The FDIC's proffered interpretation of the Bankruptcy Court's decision is a myth.  Under no stretch of the imagination did the Bankruptcy Court base its decision that the Tax Refund belongs to the Holding Company on a perceived right of the Holding Company to borrow a tax

---

[15] The cases cited by the FDIC stand simply for the proposition that a party that repudiates or otherwise materially breaches a contract cannot thereafter seek damages from the counterparty for failing to perform its obligations under the contract.  See, e.g., Am. Net, Inc. v. U.S. Cover, Inc., 532 S.E. 2d 756, 760 (Ga. Ct. App. 2000) ("a plaintiff whose breach of contract is so material as to amount to a repudiation of the contract itself, may not recover upon breach of such contract by the defendant").  In the Tax Refund Action, the Debtor is not seeking to recover damages from the Bank for breach of the Tax Sharing Agreement.  The cases cited by the FDIC thus have no application to the declaration sought in this action of the Debtor's rights with respect to the Tax Refund.

US2008 2210243.8

refund from the Debtor for thirty days.  The Bankruptcy Court's decision was based on the inescapable conclusion that, under the Tax Sharing Agreement, the Debtor, not the IRS, is the Bank's obligor with respect to payments due the Bank Affiliated Group in respect of its tax attributes.  Thus, the economic reality of the Tax Sharing Agreement is the creation of a debtor-creditor rather than trustee-beneficiary relationship between the Debtor and the Bank with respect to amounts equivalent to the amounts to which the Bank Affiliated Group would be entitled if filing separately, leading to the conclusion that tax refunds from the IRS paid in respect of consolidated tax return filings belong to the Debtor.

In instituting the Tax Refund Action, the Liquidating Supervisor did not seek to compel performance by the Bank of an executory obligation under the Tax Sharing Agreement.  Instead, he sought a determination that the Tax Refund belongs to the Debtor and should be turned over from escrow to the Debtor's estate.  The Bankruptcy Court correctly made the determination that the Tax Refund is property of the Debtor's estate and that any rejection of the Tax Sharing Agreement had no effect on the Debtor's beneficial interest in the Tax Refund, which vested prior to the Chapter 11 filing.

## CONCLUSION

The Debtor, the Bank, and the other members of the Consolidated Group entered into the Tax Sharing Agreement in order to allocate their respective rights and obligations with respect to the reporting and payment of taxes and to establish the relationships among themselves with respect to tax attributes such as net operating losses and tax refunds.  Pursuant to the Tax Sharing Agreement, the Debtor did not function as a collection agent under the direction and control of any other member of the Consolidated Group, including the Bank, with respect to tax refunds.  In fact, the Debtor had unfettered discretion to determine whether a refund would be sought in the

US2008 2210243.8

case of an overpayment or whether the overpayment would be credited against future tax liability. However, the Debtor also had an obligation under the Tax Sharing Agreement to pay the Bank the amount of any benefits to which the Bank Affiliated Group would have been entitled based on their tax attributes if the Bank Affiliated Group had filed a separate tax return. This obligation was not conditioned upon receipt by the Debtor of a refund from the IRS but instead was **an independent contractual commitment** of the Debtor to the Bank. The Debtor had an obligation to pay regardless of whether a refund was forthcoming from the IRS. The contractual arrangement between the Debtor and the Bank embodied in the Tax Sharing Agreement resulted in the creation of a debtor-creditor relationship between the Debtor and the Bank.

In accordance with the Tax Sharing Agreement, the Debtor had unfettered dominion and control over refunds received from the IRS. The Debtor was not required to segregate tax refunds from its other assets or otherwise hold the refunds in trust for other members of the Consolidated Group. Based on these facts and the indisputable debtor-creditor relationship between the Debtor and the Bank created under the Tax Sharing Agreement regarding the tax attributes of the Bank Affiliated Group, the rights to tax refunds from the IRS necessarily belonged to the Debtor. Supported by the decisions in <u>Team Financial,</u> <u>First Central Financial Corp.</u> and <u>Franklin Savings Corp.</u>, the Bankruptcy Court correctly determined that the right to receive the Tax Refund belonged to the Debtor on the Petition Date and thus became property of the estate under Section 541 of the Bankruptcy Code on that date.

The Bankruptcy Court further correctly decided that his finding that the Tax Refund constituted property of the Debtor's estate would be unaffected even if the Tax Sharing Agreement was an executory contract that was rejected pursuant to the Debtor's Plan, because

34

rejection is not equivalent to termination or rescission of an executory contract and the Debtor's

ownership interest in the Tax Refund vested prior to the Chapter 11 filing.  For these reasons, the

Liquidating Supervisor respectfully submits that this Court should affirm the Bankruptcy Court's

Summary Judgment Decision pursuant to which it (i) determined that the Tax Refund is property

of the Debtor's estate,  and (ii) directed that the Tax Refund, which currently is being held in

escrow, be turned over to the Liquidating Supervisor on behalf of the Debtor's estate.

Dated:  March 16, 2011.

> KILPATRICK TOWNSEND & STOCKTON LLP
>
> By:  /s/ Shane G. Ramsey
>     Todd C. Meyers
>     Georgia Bar No. 503756
>     Alfred S. Lurey
>     Georgia Bar No. 461500
>     Shane G. Ramsey
>     Florida Bar No. 026842
>     1100 Peachtree Street, Suite 2800
>     Atlanta, Georgia  30309
>     (404) 815-6500 (Telephone)
>     tmeyers@kilpatricktownsend.com
>     alurey@kilpatricktownsend.com
>     sramsey@kilpatricktownsend.com
>
> - AND -
>
> ROGERS TOWERS, P.A.
> Betsy C. Cox
> Florida Bar No. 307033
> 1301 Riverplace Boulevard, Suite 1500
> Jacksonville, Florida  32207
> (904) 398-3911 (Telephone)
> bcox@rtlaw.com
>
> Attorneys for Appellee Clifford Zucker,
> in his capacity as the Liquidating Supervisor
> for NetBank, Inc.

US2008 2210243.8

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2011, a copy of the foregoing document was filed electronically using the CM/ECF system, which will send a Notice of Electronic Filing to all participants who are registered CM/ECF users.

/s/ Shane G. Ramsey
Shane G. Ramsey

US2008 2210243.8