**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

In re:

NETBANK, INC.

      Debtor.

—————————————————————

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
NetBank, f.s.b.,

      Appellant,

v.

CLIFFORD ZUCKER, in his capacity as
Liquidating Supervisor for NETBANK,
INC.,

      Appellee.

—————————————————————

Case No.: 3:11-cv-00011-MMH

**REPLY BRIEF OF APPELLANT**
**FEDERAL DEPOSIT INSURANCE**
**CORPORATION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

ARGUMENT ............................................................................................................. 1

  I.  Neither the economic reality nor express terms of the Agreement support a finding of a debtor-creditor relationship .......................................................................... 2

    A.  The Agreement cannot be construed to give the Holding Company a beneficial interest in the Refund without violating 12 U.S.C. § 371c and the Agreement's own terms ................................................................................................... 3

      1.  Zucker's construction of the Agreement violates 12 U.S.C. § 371c ......... 3

      2.  The parties incorporated the Interagency Statement's guidance in their Agreement, and a debtor-creditor relationship would be inconsistent with that guidance ........................................................................................ 7

    B.  The provisions of the Agreement on which Zucker relies do not create a debtor-creditor relationship ................................................................................... 10

  II.  Because Zucker has rejected the Agreement, he may not enforce its terms ..................... 16

CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Auto Dealer Servs., Inc. v. Prestige Motor Car Imports, Inc. (In re Auto Dealer Servs., Inc.)*,
  96 B.R. 360, 364 (Bankr. M.D. Fla. 1989) ....................................................................16

*BSD Bancorp, Inc. v. FDIC (In re BSD Bancorp, Inc.)*,
  No. 94-1341-IEG (S.D. Cal. Feb. 28, 1995)............................................................2, 5, 8

*Lubin v. FDIC*,
  2011 WL 825751 (N.D. Ga. March 2, 2011)........................................................ *passim*

*Official Committee of Unsecured Creditors of TOUSA, Inc. v. Citicorp North America, Inc.*
  *(In re TOUSA, Inc.)*,
  406 B.R. 421 (Bankr. S.D. Fla. 2009)............................................................................16

*Paladino v. Avnet Computer Technologies, Inc.*,
  134 F.3d 1054 (11th Cir. 1998) ......................................................................................3

*Pan American World Airways, Inc. v. Shulman Transport Enterprises, Inc. (In re Shulman*
  *Transport Enterprises, Inc.)*,
  744 F.2d 293 (2d Cir. 1984)............................................................................................5

*RTC v. Franklin Sav. Corp. (In re Franklin Sav. Corp.)*,
  182 B.R. 859 (D. Kan. 1995) .......................................................................................6, 7

*Segal v. Rochelle*,
  382 U.S. 375 (1966)........................................................................................................16

*Team Financial, Inc. v. FDIC (In re Team Financial, Inc.)*,
  2010 WL 1730681 (Bankr. D. Kan. April 27, 2010).....................................................6, 7

*Western Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler Plymouth Corp.)*,
  473 F.2d 262 (9th Cir. 1973) ..........................................................................................2

## STATUTES AND REGULATIONS

11 U.S.C. § 365.......................................................................................................................16

11 U.S.C. § 365(c)(2)...............................................................................................................17

11 U.S.C. § 365(g) ...................................................................................................................16

11 U.S.C. § 541(d) ...................................................................................................1

12 U.S.C. § 371c ............................................................................................. passim

12 U.S.C. § 371c(c)................................................................................................5, 6

12 U.S.C. § 375b(9)(D)..............................................................................................4

12 U.S.C. § 1468(a) ...................................................................................................3

12 U.S.C. § 1468(b) ...................................................................................................4

26 U.S.C. § 6402(a) .................................................................................................15

12 C.F.R. § 563.41 .....................................................................................................3

Treasury Regulation § 1.1502-77(a) ......................................................................12

Treasury Regulation § 1.1502-77(a)(2) ..................................................................14

## OTHER

63 Fed. Reg. 64757 (Nov. 23, 1998)................................................................ passim

Black's Law Dictionary (7th ed. 1999).....................................................................4

H.R. Rep. No. 95-595 (1977), reprinted in U.S.C.C.A.N. 5963, 6306 .......................17

Office of Thrift Supervision Holding Company Handbook § 400.18 (March 2009) ...................13

Restatement (Second) of Contracts § 178..................................................................6

Restatement (Second) of Contracts § 203(a) .............................................................3

**ARGUMENT**

As the FDIC has demonstrated, the tax allocation agreement between the Bank and the Holding Company explicitly states the parties' intent to allocate the Refund to the Bank Affiliated Group, and to require distribution of the Refund upon receipt, with a thirty-day grace period.  This is the economic reality of the Agreement.  Nothing in this arrangement expresses an intention to give the Holding Company a beneficial interest in the Refund that would render it property of the bankruptcy estate.  *See* 11 U.S.C. § 541(d).

The bankruptcy court found such an interest only after a strained and flawed analysis that relied primarily on what the Agreement *does not* say.  The court focused on the lack of segregation and escrow requirements, which it implied gave the Holding Company unfettered use of the Refund pending distribution to the Bank.  But the court failed to recognize that this interpretation creates an illegal loan or extension of credit under federal banking law, and that compliance with the federal banking law would render segregation or escrow superfluous.

The court also plucked one phrase out of Section 4(e) of the Agreement—the requirement that the Holding Company pay the Bank Affiliated Group the refund it would have received if it had filed separately, "regardless of whether the consolidated group is receiving a refund"—to support its finding of a debtor-creditor relationship.  This provision, however, does not necessitate that conclusion, and, in fact, reinforces the conclusion that the parties intended to be bound by regulatory guidance that prohibits characterization of Bank refunds as the Holding Company's property.

1

Zucker's arguments fare no better.  He repeats the bankruptcy court's mistakes by relying on the lack of segregation and escrow requirements, but refuses to recognize that his argument results in an illegal extension of credit under 12 U.S.C. § 371c.  He also ignores the parties' express agreement to be bound by the regulatory guidance contained in the Interagency Statement, 63 Fed. Reg. 64757 (Nov. 23, 1998), and turns the Statement on its head by asserting that, notwithstanding its express language to the contrary, the Statement encourages the very result it was adopted to prevent.  In the end, Zucker's arguments only reinforce the conclusion that nothing in the Agreement, when considered in its entirety and in the proper regulatory context, demonstrates intent to supersede the Holding Company's presumptive agency status and give the Holding Company a beneficial interest in the Refund.

I.   **Neither the economic reality nor express terms of the Agreement support a finding of a debtor-creditor relationship.**

Under the universal rule set forth in *Bob Richards* and its progeny, a consolidated group parent receives tax refunds as agent-trustee for the group member whose earnings history generated the refund, unless an agreement gives the parent a "right to keep the refund."  *See Western Dealer Mgmt., Inc. v. England* (*In re Bob Richards Chrysler Plymouth Corp.*), 473 F.2d 262, 265 (9th Cir. 1973).  Under this rule, the crucial question in determining ownership of a refund is not simply whether an agreement exists, but the *nature* of the interests created by the agreement.  *See id.*; *Lubin v. FDIC*, 2011 WL 825751, at *5 (N.D. Ga. March 2, 2011); *BSD Bancorp, Inc. v. FDIC* (*In re BSD Bancorp, Inc.*), No. 94-1341-IEG at 10 (S.D. Cal. Feb. 28, 1995) (FDIC Opening Br., Add. F).  Based on facts almost identical to the instant appeal, the District Court for the Northern District of Georgia recently held in *Lubin v. FDIC* that an agreement that allocated tax refunds to a bank

2

subsidiary did not create a debtor-creditor relationship with the bankrupt parent because the agreement "as a whole … does not override the presumptive principal-agent relationship." 2011 WL 825751, at *5.

Here, there is no dispute that the Agreement allocates the Refund to the Bank Affiliated Group, and requires the Refund to be distributed upon receipt, with a thirty-day grace period.  Adv. Pro. Dkt. #1, Ex. B § 4(d)-(e).  Although this intent is clear on the face of the Agreement, Zucker posits an alternative "economic reality," contending that the Agreement gives the Holding Company an interest in the Refund such that the Bank Affiliated Group becomes a mere creditor of the Holding Company's bankruptcy estate. Like the bankruptcy court, however, he fails to take into account the regulatory context in which the Agreement was made—a vital component of any assessment of the Agreement's intended economic consequences.  That context conclusively shows that the parties would not have intended to create a debtor-creditor relationship.

### A. The Agreement cannot be construed to give the Holding Company a beneficial interest in the Refund without violating 12 U.S.C. § 371c and the Agreement's own terms.

#### 1. Zucker's construction of the Agreement violates 12 U.S.C. § 371c.[1]

Zucker's proposed interpretation of the Agreement violates one of the most elementary of contract interpretation principles—the avoidance of an illegal result.  *See Paladino v. Avnet Computer Technologies, Inc*., 134 F.3d 1054, 1058 (11th Cir. 1998); Restatement (Second) of Contracts § 203(a).  Although Zucker fervently denies that the

---

[1] While 12 U.S.C. § 371c applies to Federal Reserve member banks, the statute is made applicable to savings associations, such as NetBank f.s.b., by 12 U.S.C. § 1468(a) and 12 C.F.R. § 563.41.  For simplicity, the FDIC has cited only 12 U.S.C. § 371c throughout.

debtor-creditor relationship he advocates depends on any "right to borrow tax refunds from the Bank," (Zucker Br. at 29), the "debt" found by the bankruptcy court can only be a loan or extension of credit.

Both Zucker and the bankruptcy court rely heavily on the Agreement's lack of segregation, escrow, or use restrictions to support a finding of a debtor-creditor relationship. Adv. Pro. Dkt. #64 at 21-22; Zucker Br. 14-15. The clear import of this emphasis is that a debtor-creditor relationship exists because the Agreement gives the Holding Company an unrestricted right to temporarily use the Refund pending distribution to the Bank Affiliated Group. Adv. Pro. Dkt. #64 at 19, 21-22. Such an agreement is the classic definition of a loan—"a grant of something for temporary use." Black's Law Dictionary 947 (7th ed. 1999) (defining "loan").

Zucker attempts to distinguish his interpretation of the Agreement from a loan or extension of credit by naming it an "independent contractual agreement to pay," (Zucker Br. at 29), but this is a distinction without a difference. As the definition of "extension of credit" appearing in the same subchapter as § 371c demonstrates, a transaction satisfies the definition as long as it would result in a person "becom[ing] obligated (directly or indirectly, or by any means whatsoever) to pay money or its equivalent to the bank." 12 U.S.C. § 375b(9)(D) (defining "extension of credit" in statute restricting loans to bank officers, directors, and principal shareholders); *see also* 12 U.S.C. § 1468(b) (making 12 U.S.C. § 375b applicable to savings associations). Under Zucker's interpretation, the Holding Company would be obligated to pay money to the bank—this would be an extension of credit, regardless of the terminology Zucker chooses to employ.

Indeed, *Pan American World Airways, Inc. v. Shulman Transport Enterprises, Inc.* (*In re Shulman Transport Enterprises, Inc.*), 744 F.2d 293 (2d Cir. 1984), a case on which Zucker and the bankruptcy court place great emphasis, actually supports the view that a debtor-creditor relationship is necessarily based on an extension of credit.  That case addressed whether, under the parties' agreement, a shipping intermediary acted as the agent of members of an association of carriers in collecting shipping fees owed by the intermediary's customers.  The court explained that if the contract did not require the shipping intermediary to pay the carriers as agent, "but payment monthly out of appellee's general funds was sufficient, an extension of credit would be established."  *Id.*  Thus, the distinction Zucker attempts to draw between a loan for purposes of 12 U.S.C. § 371c, and the unrestricted use of funds that the bankruptcy court found to support a debtor-creditor relationship, is illusory.

Zucker also has no answer to the FDIC's argument that, if the Agreement creates a loan, it would violate 12 U.S.C. § 371c.  Zucker Br. at 28-29.  Because the Agreement makes no provision for collateral, the Holding Company could not use the Refund without violating federal law.  *See* 12 U.S.C. § 371c(c).  It defies logic to conclude that the parties would have intended such a violation.  *Cf.* FDIC Opening Br., Add. F at 11-12 (where agreement recognized that any loan from the bank to the parent would be subject to regulations governing affiliate loans, "[f]or a debtor-creditor relationship to arise … there would presumably have to be some further agreement through which [the parent] supplied collateral meeting the requirements of § 371c(c)(1)").  Moreover, such an

5

agreement would be unenforceable on grounds of public policy. *See* Restatement (Second) of Contracts § 178.

The statutory constraints on the parties' ability to create an extension of credit, whether expressly or impliedly, distinguish this case from *Superintendent of Insurance v. First Central Financial Corp.* (*In re First Central Financial Corp.*), 269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd* 377 F.3d 209 (2d Cir. 2004), on which both Zucker and the bankruptcy court heavily rely. Zucker Br. at 15-18; Adv. Pro. Dkt. #64 at 15-18, 21-22. Even if its analysis were sound, and it is not, *First Central* did not involve a bank subsidiary, and no restriction similar to 12 U.S.C. § 371c prevented the parties from entering into an agreement that would allow the parent to use the subsidiary's tax refunds pending distribution. *See First Central*, 269 B.R. at 484.

Although Zucker also relies on two cases that did involve bank subsidiaries, those decisions are the product of faulty logic, and are similarly distinguishable because neither addressed the impact of the collateral requirement in 12 U.S.C. § 371c(c). *Cf. RTC v. Franklin Sav. Corp.* (*In re Franklin Sav. Corp.*), 182 B.R. 859, 863 (D. Kan. 1995); *Team Financial, Inc. v. FDIC* (*In re Team Financial, Inc.*), 2010 WL 1730681, at *10 (Bankr. D. Kan. April 27, 2010) (finding the record insufficient to determine if the tax allocation agreement violated the transaction limits in 12 U.S.C. § 371c(a)). Instead, the courts in both instances focused on select words in the agreements, such as "reimbursement" and "pay," to find intent to create a debtor-creditor relationship. *Franklin Sav.*, 182 B.R. at 863; *Team Financial*, 2010 WL 1730681, at *11. This superficial analysis is unpersuasive, particularly in light of the significant statutory and regulatory constraints on banks' ability to give their

parents unrestricted use of tax refunds owed to them.[2]  Moreover, the Agreement here differs

significantly from the agreements considered in *Franklin Savings* and *Team Financial*.

Neither of those agreements expressly incorporated the Interagency Statement's guidance,

and for the reasons discussed below, that incorporation provides further evidence of the

parties' intent to avoid the creation of a debtor-creditor relationship.  *Cf. Team Financial*,

2010 WL 1730681, at *8-9.[3]

**2.  The parties incorporated the Interagency Statement's guidance in their Agreement, and a debtor-creditor relationship would be inconsistent with that guidance.**

Just as 12 U.S.C. § 371c precludes an interpretation that would create an extension of

credit from the Bank Affiliated Group to the Holding Company, Section 10(a) of the

Agreement precludes an interpretation that would conflict with the Interagency Statement

and result in "less favorable treatment" than if the Bank had filed a separate tax return.  Adv.

Pro. Dkt. #1, Ex. B § 10(a).  Section 10(a) sets forth the parties' unambiguous intent to

"allocate the tax liability in accordance with the Interagency Statement," which "should

result in no less favorable treatment to the Bank Affiliated Group than if it had filed its

income tax return as a separate entity."  *Id.*  This section expresses the parties' clear intent to

_____

[2] *Team Financial* also provides little support for Zucker's argument because the court's determination appeared in an interlocutory order, and its conclusions are subject to change. *See Team Financial*, Adv. No. 09-5084, Agreed Order Partially Granting Motion by the FDIC-R to Clarify, Vacate, Alter or Amend the Court's April 28, 2010 Memorandum Opinion, Dkt. #65 (Bankr. D. Kan. June 11, 2010) (Add. A).

[3] Although *Franklin Savings* was decided before publication of the Interagency Statement, the court did not address the substantially similar individual agency guidance in effect at the time.  *See* 63 Fed. Reg. at 64758 (stating that "[t]his interagency policy statement does not materially change any of the guidance previously issued by any of the Agencies," including the "OTS Tax-Sharing Policy" contained in the OTS Holding Companies Handbook).

be bound by the Interagency Statement's guidance on the structure of allocation agreements, including its instruction that agreements "should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent."  63 Fed. Reg. at 64759.

Thus, whether the Interagency Statement has the force of law by itself is not at issue. Zucker attempts to discount the effect of the Interagency Statement by arguing that it "is suggestive, not prohibitory."  Zucker Br. at 24.  In this case, however, the Interagency Statement binds the parties because they *chose* to incorporate the Statement into their Agreement.  Section 10(a) makes this intent clear.

Zucker also contends that, even if the Interagency Statement were binding, his interpretation would not violate its proscriptions.  First, he makes the baffling assertion that the Agreement "does not purport to 'characterize' tax refunds as the property of any member of the Consolidated Group."  Zucker Br. at 25.  But the very foundation underlying his argument that the Agreement creates a debtor-creditor relationship is the premise that the Agreement not only "purports" to characterize, but does, in fact, characterize the Refund as the property of the Holding Company.  Zucker cannot have it both ways.  If the Agreement does not characterize the Refund as the property of the Holding Company, then there can be no debtor-creditor relationship.  *See Lubin*, 2011 WL 825751, at *5-6; FDIC Opening Br., Add. F at 9-12.

Second, Zucker argues that, despite the Interagency Statement's clear proscription against characterizing bank refunds as the Holding Company's property and statement that banks should receive no less favorable treatment than if they had filed separate tax returns,

8

the Interagency Statement actually "encourages the structuring of tax sharing agreements in a manner that fosters the creation of debtor-creditor relationships." Zucker Br. at 25-26. This cannot be true because it would contravene the very purpose of the Interagency Statement— to ensure that the procedural filing of consolidated tax returns does not put subsidiary banks in a worse position than if they had filed separate returns. *See* 63 Fed. Reg. at 64757 ("The interagency policy statement reaffirms that intercorporate tax settlements between an institution and the consolidated group should result in no less favorable treatment to the institution than if it had filed its income tax return as a separate entity."). Zucker offers no explanation as to why the federal banking regulators would wish to ensure no less favorable treatment of subsidiary banks, only to "encourage" agreements that do exactly that.

Zucker's only basis for his audacious assertion that the Interagency Statement "encourages" the creation of debtor-creditor relationships is the statement, mirrored in Section 4(e) of the Agreement, that a "refund should be made to the institution within a reasonable period following the date the institution would have filed its own return, regardless of whether the consolidated group is receiving a refund." Zucker Br. at 25 (quoting 63 Fed. Reg. at 64758.) But, as explained below in Part I.B.1, this language was not intended to, and does not, create a debtor-creditor relationship. *See Lubin*, 2011 WL 825751, at *5.

Finally, Zucker claims that the "no less favorable treatment" standard in the Interagency Statement and the Agreement was only intended to apply to the "amount and timing" of refund payments to the bank. Zucker Br. at 27. Even if this were true, it provides further support for the FDIC's position. The undeniable result of Zucker's interpretation of

the Agreement is that the Bank would be required to file a claim for the Refund in the Holding Company's bankruptcy proceedings. This would necessarily affect the amount and timing of the Refund payment to the Bank—payment would be substantially delayed and the Bank would likely receive substantially less than the entire amount of its Refund depending on the extent of other creditors' claims. Thus, even if "no less favorable treatment" refers only to the amount and timing of refund payments, those are precisely the ways in which the Bank would be treated less favorably under Zucker's interpretation of the Agreement.

## B. The provisions of the Agreement on which Zucker relies do not create a debtor-creditor relationship.

Contrary to their statements that the economic reality of the Agreement should control, both Zucker and the bankruptcy court rely on isolated provisions of the Agreement to cobble together support for the theory that the Agreement creates a debtor-creditor relationship. Zucker Br. at 12-15; Adv. Pro. Dkt. #64 at 28.

1. Zucker relies primarily on Section 4(e) of the Agreement, which provides that if, as here, the Bank Affiliated Group incurs a net operating loss, "the amount payable to the Bank Affiliated Group by NetBank shall be no less than the amount the Bank would have received as a separate entity (including its subsidiaries), regardless of whether the consolidated group is receiving a refund." Adv. Pro. Dkt. #1, Ex. B § 4(e); *see also id*. § 10(a)(iii). Zucker asserts that the right of the Bank Affiliated Group to receive an amount equal to what it would have received if it had filed separately, regardless of the actual refund received, or the actual amounts collected from other members of the consolidated group under the Agreement, means that the Holding Company has a duty to pay that is not an

agency obligation.[4]  As a recent case from the Northern District of Georgia indicates,
however, the language in Section 4(e) "does not override the presumptive principal-agent
relationship."  *See Lubin*, 2011 WL 825751, at *5.

    In *Lubin*, the court faced a tax allocation agreement very similar to the Agreement
here.  As in this case, the agreement allocated tax refunds to the bank when the bank's
earnings history generated the refund.  *Id*.  The agreement also stated that the bank's refund
should be "in an amount no less than the amount the Bank would have been entitled to
receive as a separate entity[, and t]he refund should be made to the Bank within a reasonable
period following the date the Bank would have filed its own return, regardless of whether
[the Consolidated Group] is receiving a refund."  *Id*.  Despite this agreement to pay
regardless of whether a refund is received, the court held that the agreement "does not
override the presumptive principal-agent relationship."  *Id*.

    While the *Lubin* agreement expressly stated that the Holding Company receives tax
refunds "as agent of the consolidated group," and that the agreement "should not be intended
to consider refunds attributable to the subsidiary banks, which are received by the Holding
Company from the taxing authority, as the property of the Holding Company," *id.*, these

---

[4] This argument implies that there may be situations in which the refund received or the
amount collected from the other Consolidated Group members is less than the amount owed
to the Bank, making the Holding Company responsible for any shortfall.  Neither Zucker nor
the bankruptcy court have explained, however, how such a shortfall could occur.  The refund
owed to the Bank Affiliated Group would be less than the consolidated refund received only
if the other members of the Consolidated Group had sufficient income to offset the Bank
Affiliated Group's losses.  But, if that were the case, the other members would be obligated
to make payments to the Holding Company under Section 3 of the Agreement.  Adv. Pro.
Dkt. #1, Ex. B § 3.  Thus, the Holding Company would have no independent obligation to
pay the Bank.  Its only obligation would be to fulfill its agency obligations to collect taxes
and distribute refunds under the Agreement.

statements provide no basis for distinguishing the Agreement here.  They are simply an explicit recital of principles from the Interagency Statement that the NetBank Agreement incorporates by reference in Section 10(a).  *See* 63 Fed. Reg. at 64759.[5]  Because the NetBank Agreement incorporates the same default agency principles as those explicitly stated in the *Lubin* agreement, the same result should follow.

Even if the *Lubin* agreement could be distinguished from the Agreement here, Section 4(e) would not support a finding of a debtor-creditor relationship.  The directive in Section 4(e), like many other provisions in the Agreement, simply adopts language in the Interagency Statement.  Any analysis of this provision thus should be guided by the purpose of the Statement, particularly in light of the parties' express intent to allocate tax liability in accordance with its guidance.  *See* Adv. Pro. Dkt. #1, Ex. B § 10(a).  The Interagency Statement provides that an institution incurring a loss should:

> receive a refund from its parent in an amount no less than the amount the institution would have been entitled to receive as a separate entity.  The refund should be made to the institution within a reasonable period following the date the institution would have filed its own return, *regardless of whether the consolidated group is receiving a refund.*

63 Fed. Reg. at 64758 (emphasis added).  Sections 4(d) and 4(e) implement these requirements.  Contrary to Zucker's interpretation, however, the Interagency Statement explains that these prescriptions are meant to *avoid* the creation of a debt between a bank and its parent: if a holding company fails to pay the amount due to the bank within a reasonable period, "the institution's primary federal regulator may consider the

---

[5] The Interagency Statement cites Treasury Regulation 1.1502-77(a) as support for its statement that the parent company receives tax refunds as agent for the consolidated group. 63 Fed. Reg. at 64759 n.3.  This regulation applies to all consolidated group parents, including the Holding Company.

receivable as either an extension of credit or a dividend from the subsidiary to the parent." 63 Fed. Reg. at 64758.[6]   Neither of these may occur without complying with certain regulations and statutory requirements, including 12 U.S.C. § 371c, none of which the Agreement appears to contemplate.

Like the other guidelines in the Interagency Statement, the guarantee that the bank should receive its refund "regardless of whether the consolidated group is receiving a refund" is designed to protect the safety and soundness of the bank, and ensure that the bank does not subsidize the parent or other group members.  *See* 63 Fed. Reg. at 64758 ("[a]ny practice that is not consistent with this policy statement may be viewed as an unsafe and unsound practice prompting either informal or formal corrective action" by the bank's primary federal regulator).  Construing Section 4(e), in isolation, as creating a debtor-creditor relationship, which would clearly disadvantage the Bank, flies in the face of this purpose, and ignores the regulatory constraints on the Agreement.  Just as an agreement should not be construed as intending an illegal purpose, it defies logic to think that the parties would have intended Section 4(e) to have any meaning other than what the Interagency Statement contemplates—to ensure that refunds attributable to the Bank are preserved for the Bank.  A contrary debtor-creditor intent can only result in the conclusion that the parties intended to engage in an unsafe and unsound practice.

---

[6] Guidance published by the Office of Thrift Supervision, the Bank's primary federal regulator, confirms that "if the holding company does not promptly downstream a tax refund due to a thrift, it may be an unsecured loan and a violation of the affiliate regulations." Office of Thrift Supervision Holding Company Handbook § 400.18 (March 2009) (*available at* http://www.ots.treas.gov/files/4210029.pdf ) (last visited April 11, 2011).

2.      Zucker's reliance on Section 9(c) of the Agreement to support his argument against agency is also flawed.  Zucker asserts that Section 9(c) is inconsistent with the Holding Company's agency status because it gives the Holding Company "the right, in its discretion, to elect to have [a consolidated] refund amount applied to payment of a subsequent year's taxes."  Zucker Br. at 13.  Section 9(c) is not so broad, however.  It simply provides that the Holding Company shall have the right "to file, prosecute, compromise or settle any claim the [Consolidated] Group may be entitled shall be paid by the way of refund or credited against the tax liability of the [Consolidated] Group."  Adv. Pro. Dkt. #1, Ex. B § 9(c).  Nowhere does Section 9(c) say that the Holding Company may elect a credit instead of a refund.  It simply permits the Holding Company, as agent, to settle claims, which would entitle the Consolidated Group to a refund or credit against tax liability.

Like the other procedural powers listed in Section 9, the power to pursue and settle claims on behalf of the Consolidated Group is one of the agency functions the parent of any consolidated group would perform under the Treasury Regulations.  Treasury Regulation § 1.1502-77(a)(2), which lists "Examples of matters subject to agency," states that the parent of a consolidated group has the power to "give[] waivers … and execute[] closing agreements, offers in compromise, and all other documents" on behalf of the consolidated group.  The settlement authority described in Section 9(c) therefore is consistent with the Holding Company's status as agent for the consolidated group, and does not support a finding of a debtor-creditor relationship.  Just as the right to

14

file a claim for a refund on behalf of the Consolidated Group does not make the refund the Holding Company's property, neither does the right to file a claim for a credit.

Moreover, the broad power that Zucker reads into Section 9(c) is an illusion. When a taxpayer has an existing tax liability and a claim filed by the parent is ultimately determined to reduce that liability, the IRS may credit the reduction against the outstanding liability. *See* 26 U.S.C. § 6402(a). Under this authority, the IRS, not the Holding Company, decides whether to apply a credit.

The only situation in which the Holding Company might have the option of choosing between a credit and a refund would be if the Consolidated Group had no outstanding tax liability. In such circumstances, however, it would be economically irrational to choose a credit unless an estimated tax payment in a similar amount would soon be due, and a credit would save the administrative cost of processing a refund check and an estimated payment check.[7] Otherwise the credit would act as an interest-free loan to the IRS until the time when it could be used.

In short, Section 9(c) is part of the Holding Company's agency powers, and does not override the parties' plain intent to maintain the Holding Company's agent-trustee status. The bankruptcy court correctly rejected this argument when it held that "Section 9(c) refers specifically to procedural matters and does not establish a debtor-creditor relationship." Adv. Pro. Dkt. #64 at 26.

---

[7] Even in these circumstances, however, the Bank would realize an immediate benefit just as if it had received a refund because the credit would reduce the amount it would be obligated to pay under Section 3 of the Agreement.

15

**II.     Because Zucker has rejected the Agreement, he may not enforce its terms.**

Even if the Agreement could be interpreted to give the Holding Company a beneficial interest in the Refund, Zucker's rejection of the Agreement precludes him from enforcing it. As explained in the FDIC's Opening Brief, rejection of the Agreement under 11 U.S.C. § 365 acts as a breach, which precludes post-petition enforcement by the breaching party.[8]  *See* 11 U.S.C. § 365(g); *see also, e.g.*, *Auto Dealer Servs., Inc. v. Prestige Motor Car Imports, Inc.* (*In re Auto Dealer Servs., Inc.*), 96 B.R. 360, 364 (Bankr. M.D. Fla. 1989).

The effect of rejection in this case hinges on whether any beneficial interest in the Refund passed to the Holding Company before the petition date.  Zucker provides no analysis of this key question, relying only on a case that stands for the unremarkable principle that a taxpayer's right to a refund arises at the end of the tax year in which the refund is claimed.  Zucker Br. at 31-32 (citing *Official Committee of Unsecured Creditors of TOUSA, Inc. v. Citicorp North America, Inc.* (*In re TOUSA, Inc.*), 406 B.R. 421, 432-33 (Bankr. S.D. Fla. 2009)).  That is not the issue here.  There is no question that the *taxpayer's* (*i.e.*, the *Consolidated Group's*) right to the Refund vested pre-petition.  *See Segal v. Rochelle*, 382 U.S. 375, 380 (1966) (loss carryback refund claim based on pre-petition net operating losses and taxes was "sufficiently rooted in the pre-bankruptcy past" that it should

---

[8] Although Zucker places great emphasis on the fact that the bankruptcy court assumed without deciding that the Agreement was an executory contract, he makes no argument that the Agreement is not subject to 11 U.S.C. § 365.  The Agreement clearly satisfies the definition of an executory contract because the Holding Company's duties as consolidated parent were not completed, and the Bank had a continuing obligation to cooperate with the Holding Company with respect to the consolidated tax filings.  *See, e.g.*, Adv. Pro. Dkt. #1, Ex. B § 3(a).

be regarded as bankruptcy estate property).  The only question is whether the *Holding Company* acquired its interest in the Refund pre-petition.[9]

Zucker cites no authority to support his attempt to equate the Holding Company's individual interest with that of the consolidated taxpayer.  The only basis the bankruptcy court found for the Holding Company's interest in the Refund was the debtor-creditor relationship created by operation and enforcement of the Agreement.  No "debt" could arise, however, until the Refund was paid and the Holding Company retained the Refund for its own use.  Because the Refund was not paid until almost eighteen months after the petition was filed, (Dkt. #40), neither of these events could have occurred pre-petition, and the decision to reject the Agreement prevents Zucker from now attempting to enforce its terms.

In addition, the Bankruptcy Code shows that Congress did not intend to give bankruptcy trustees the power to enforce pre-petition agreements to provide credit.  Specifically, 11 U.S.C. § 365(c)(2) prohibits trustees from assuming loan or other financial accommodation agreements "to prevent the trustee from requiring new advances of money or other property."  H.R. Rep. No. 95-595, at 348 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6306.  By allowing the Holding Company to enforce the Agreement, even though its only interest in the Refund arose from a perceived temporary extension of credit from the Bank, the bankruptcy court's decision runs counter to the policy underlying 11 U.S.C. § 365(c)(2).

_____

[9] Zucker attempts to divert attention from this key question by arguing that the FDIC's position depends on whether rejection would require the return of property already acquired. Zucker Br. at 31.  This is nothing more than a straw man.  The FDIC has not argued, and need not argue, that rejection is equivalent to rescission.  The Holding Company's rejection prevented it from acquiring any beneficial interest in the Refund, so it has no interest that would need to be "returned" or "rescinded."

17

## CONCLUSION

For the foregoing reasons, the Court should reverse the bankruptcy court's decision and judgment, as amended, and remand with instructions to enter summary judgment in favor of the FDIC.

Respectfully submitted,

Dated: April 11, 2011

s/David E. Otero_____
DAVID E. OTERO
Florida Bar No.: 651370
ADINA L. POLLAN
Florida Bar No.: 15639
AKERMAN SENTERFITT
50 North Laura Street, Suite 2500
Jacksonville, FL 32202
Telephone: (904) 798-3700
Facsimile: (904) 798-3730
david.otero@akerman.com
adina.pollan@akerman.com

COLLEEN J. BOLES
Assistant General Counsel
LAWRENCE H. RICHMOND
Senior Counsel
MICHELLE OGNIBENE
Counsel
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 Fairfax Drive, VS-D-7144
Arlington, Virginia 22226-3500
Telephone: (703) 562-2121
Facsimile: (703) 562-2496
mognibene@fdic.gov

*Attorneys for Appellant Federal Deposit
Insurance Corporation, as Receiver for
NetBank, f.s.b.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2011, a copy of the foregoing was filed electronically using

the CM/ECF system, which will send a Notice of Electronic Filing to all participants who are

registered CM/ECF users.

s/Adina L. Pollan
Adina L. Pollan
